Grafton
No. 90-298

RAYMOND ADAMS *& a.*

v.

BERNARD BRADSHAW *& a.*

November 7, 1991

*Law Office of Laurence F. Gardner*, of Lebanon (*Laurence F. Gardner* on the brief and orally), for the plaintiffs.

*Law Office of Edward M. Van Dorn, Jr.*, of Woodsville (*Edward M. Van Dorn* on the defendants' joint brief and orally), for the defendants, Bernard Bradshaw, Leslie Morrison, Robert Wormer, and the Town of Monroe.

*Law Office of Kevin R. Bruno*, of Woodsville (*Kevin R. Bruno* on the defendants' joint brief), for the defendants, Bernard Bradshaw, Leslie Morrison, Robert Wormer, and the Town of Monroe.

*John P. Arnold*, attorney general (*Leslie J. Ludtke*, assistant attorney general, on the brief), by brief for the State, as *amicus curiae*.

*New Hampshire Municipal Association*, of Concord (*H. Bernard Waugh, Jr.*, on the brief), by brief as *amicus curiae*.

THAYER, J.   The defendants, the Town of Monroe (the Town) and its selectmen, appeal the Superior Court's (*Smith*, J.) determination that the Town's discontinuance of its sewer system constitutes inverse condemnation, requiring just compensation, and claim that the trial court erred in denying attorney's fees and in making certain factual findings. The plaintiffs, several property owners serviced by the sewer system, also appeal the court's decision, arguing that it erroneously allows the defendants to choose discontinuance of the sewer system over construction of a wastewater treatment plant. Moreover, the plaintiffs maintain that the trial court erred in ruling that the selectmen possessed sufficient authority to expend part of the Town capital reserve fund for the construction of septic systems to service Town-owned buildings. We reverse the trial court's finding of inverse condemnation, but affirm its denial of attorney's fees, as well as those decisions appealed by the plaintiffs.

Most of the relevant facts of this case are not in dispute. The Town built a sewer system in 1932 to service properties in its village area. In its present state, this system collects raw sewage from approximately fifty properties and spews it, untreated, into the Connecticut River. In 1971, the Town voted to establish a capital reserve fund for the purpose of constructing a sewage disposal unit, and voted several times thereafter to transfer tax revenue into this fund. Twice the Town hired engineers to study the feasibility of various sewage disposal options, but made no move to build a disposal unit. These engineers did not discuss construction of individual septic systems on the affected properties as an alternative to a type of wastewater treatment facility.

Meanwhile, the Town learned that its State and federal permits to pollute the Connecticut River would expire on July 1, 1988, and would not be renewed. In May 1987, the Town asked the State Water Supply and Pollution Control Division (the WSPCD) to determine the feasibility of individual septic systems in lieu of the Town's sewer. The WSPCD completed its study in August 1987, and informed the Town in mid-September that a wastewater treatment facility for the sewer could not be designed and constructed in time to meet the State and federal July 1, 1988, deadline.

Thus, the defendants turned to subsurface disposal options. At a special town meeting in November 1987, the Town voted to hire engineers "to design individual on-site subsurface disposal systems for the present users of the Monroe Town Sewer System," and to pay for their services out of the Town's capital reserve fund, which at that time totalled approximately $200,000. The engineers completed their study, and in March 1988, the Town passed the following articles:

> "17. To see if the Town will vote to change the purpose of the existing Sewer Disposal Unit Capital Reserve Fund to one with the purpose of designing and constructing a sewage disposal system or systems for the Monroe Village Sewer System that complies with Federal and State Law and Regulations.

> *     *     *

> 19. To see if the Town will vote to designate the Board of Selectmen as agents to expend the Captial [sic] Reserve Fund for the purpose for which said fund was established."

The July 1, 1988, deadline arrived, but the Town continued to operate its sewer in violation of State and federal law. As a result, the

State sued the Town. The plaintiffs also sued the Town, and the selectmen individually. In their petition for declaratory judgment and bill in equity, the plaintiffs claimed a vested property right in the Town sewer and declared illegal the Town's plans to discontinue the sewer. Among other things, the plaintiffs requested that the superior court order the selectmen to "offer to the voters of the Town the alternatives available for sewage treatment, which would be in the long-range best interest of the Village and the Town."

In February 1989, before the trial court took any action on the petition, the Town held a special meeting to determine the fate of the Town sewer, and to decide what, if anything, it should do to help the village property owners dispose of their sewage. A majority of the Town citizens voted to completely abandon the Town sewer and leave the village property owners to their own devices. The townspeople also passed Article 5, allowing the Town to construct individual subsurface disposal systems for Town-owned buildings located in the village area. The plaintiffs moved to amend their petition soon afterward to challenge the actions taken at the February town meeting and requested the trial court to:

> "order the Defendants not to expend money for the purposes set forth in Article 5 as voted on February 10, 1989 for the lack of a valid appropriation and valid vote to withdraw funds from the capital reserve fund . . . [;]
>
> enter an order preventing the abandonment of the village sewer system . . . [; and]
>
> enter an order compelling the Town to construct a wastewater treatment plant in compliance with State and federal requirements and that the cost of the plant be paid by the Town and the users charged for operation and maintenance."

In April 1989, the Town and the State entered into a consent decree in the State's lawsuit against the Town. The decree gave the Town a new deadline of October 15, 1989, for ending its discharge of raw sewage into the river. Several property owners in the village area constructed septic systems during the ensuing months and ceased utilization of the Town sewer. But by the time of the superior court's order in this case, the sewer was still in operation, and was still pumping untreated sewage into the river.

The superior court, by order dated March 13, 1990, ruled that both the expenditure of money from the capital reserve fund and the vote to discontinue the Town sewer were legal. In addition, the court

ruled that neither party was guilty of bad faith and that, therefore, neither was entitled to attorney's fees. The court went on, however, to rule that discontinuance of the sewer constitutes inverse condemnation, requiring just compensation by the Town, and enjoined discontinuance of the sewer pending any appeal or suit by the individual property owners for just compensation. Pursuant to its ruling of inverse condemnation, the court found that three properties located in the village area are incapable of sustaining on-site septic systems. Both parties appealed.

Before this court, the defendants argue that the plaintiffs have no vested property right in the sewer system, and that the trial court, therefore, erred in ruling that discontinuance of the sewer constitutes inverse condemnation. In addition, the defendants maintain that the superior court erred in denying them an award of attorney's fees, because the plaintiffs' suit against the selectmen as individuals acting in bad faith had no reasonable basis in fact. The defendants' other arguments on appeal are made moot by our decision in their favor on the first issue and are not addressed.

The plaintiffs, in turn, allege three trial court errors. First, the plaintiffs argue that the Town had no authority to stop providing them with a sewer service. Second, they argue that the Town's decision to discontinue the Town sewer, rather than construct a wastewater treatment facility, was arbitrary and unreasonable, in violation of part I, article 12 of the New Hampshire Constitution. Third, the plaintiffs claim that the selectmen's withdrawal of money from the capital reserve fund to construct on-site septic systems for Town buildings violated RSA chapter 35. We dismiss all three arguments.

We first address the plaintiffs' argument that the Town had no authority to discontinue its sewer service to the residents of the village area. The plaintiffs state in their brief that "[t]here is nothing in RSA Chapter 149-I which indicates directly or indirectly that a city or town would abandon a sewer system that had previously been installed," and that, therefore, "[o]nce a town has chosen to provide a town sewer system, the town cannot withdraw that essential service because of water pollution but, rather, . . . must take the necessary steps to abate the water pollution."

We disagree. RSA 149-I:1 grants municipalities the authority to "construct and maintain" sewers and declares that a sewer constructed by a municipality "shall be the property of the [municipality]." Thus, "[a] sewerage system constructed by a municipal corporation is its property and its right to regulate and control the

use of it is a necessary incident of its ownership." *Mitchel v. Dover*, 98 N.H. 285, 289, 99 A.2d 409, 412 (1953).

Concomitant with the right to regulate and control one's property is the right to dispose of it as one sees fit, and no statutory language is needed to support this self-evident principle. "Courts generally regard public sewers and drains as the property of the municipal corporations in which they are built, and they may be protected and controlled as any other property of the municipality, and no private person has the right to interfere with them." E. MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 31.29, at 259 (3d ed. 1991). Under most circumstances, a municipality may discontinue its sewer, leaving those previously served by it to dispose of their sewage by other means.

> "As a rule, the right given to a property owner to connect with a municipal sewer is in the nature of a license only, and . . . [s]uch a license may be revoked for cause at any time. The municipality has a right, therefore, if the sewer with which the connection is made becomes a nuisance, to require such drain to be disconnected from the sewer . . . ."

*Id.* § 31.31, at 289.

The defendants had ample cause to revoke the plaintiffs' license to use the Town sewer; it became a nuisance, as evidenced by the State's suit against the Town for polluting the Connecticut River without a permit. Although the trial court found that three affected properties are incapable of supporting on-site septic systems (a finding which the defendants contest), the defendants aver that the Town will work creatively with these property owners to ensure that no one is forced to vacate his or her property solely because of a sewer shutdown. The defendants' apparent willingness to accomodate the village property owners as much as possible in their search for new means to dispose of their sewage, where such accommodation was not necessarily required, strengthens our conclusion that the defendants had cause to discontinue the Town sewer.

The plaintiffs' second argument is that the Town's decision to choose discontinuance of the sewer over construction of a wastewater treatment facility violates part I, article 12 of the New Hampshire Constitution. This argument actually consists of two assertions. First, the Town should have voted to construct a wastewater treatment facility, particularly since public utilities own three-fourths of the real estate in the town and would therefore bear the

brunt of the construction bill. We cannot, however, second-guess a Town's decision to spare its taxpayers the cost of a treatment facility, regardless of the taxpayers' identity. "A municipality's decision not to make major capital improvements to an existing drainage system is immune as a discretionary decision." MCQUILLIN, *supra*, § 31.17, at 230. Moreover, we have previously held that a Town's "failure to take discretionary affirmative action" does not constitute a taking for purposes of part I, article 12 of our constitution. *Rockhouse Mt. Property Owners Assoc. v. Town of Conway*, 127 N.H. 593, 601, 503 A.2d 1385, 1390 (1986).

The second part of the plaintiffs' argument is that the Town's decision to discontinue the sewer constituted a taking without just compensation, in violation of part I, article 12: in other words, inverse condemnation. The trial court agreed with the plaintiffs on this issue, and the defendants appeal that ruling, arguing that the plaintiffs have no vested property right in the town sewer. This is a case of first impression for us, and we find learned treatises and decisions of our sister jurisdictions helpful on the issue.

Eugene McQuillin's treatise is a respected authority on the subject of municipal corporations. He states that "the right given to a property owner to connect with a municipal sewer . . . does not become a vested right merely because the user was put to considerable expense in constructing a drain from the premises and connecting it with the sewer." E. MCQUILLIN, *supra*, § 31.31, at 289. A municipality may, he asserts, disconnect a property owner's drain from a sewer for cause "without being liable to the owner of the drain in damages." *Id.*

This view apparently has been accepted by all States confronted with the issue. Vermont, for example, decided the question in 1894, in the case of *Camp v. Village of Barre*, 66 Vt. 563, 29 A. 1022 (1894). Camp's sewage drained into the municipality's open sewer, which had become a nuisance. Camp was ordered to disconnect his drain from the sewer.

> "The plaintiff's contention is that by the arrangement made in 1887 and his payment towards the construction of his drain and receiver he had acquired a property right in the street and a right to the use of his drain and receiver. . . . The arrangement . . . conveyed to [Camp] no property rights. It was at most a license to connect with the sewer then in use. . . . It would be anomalous to hold that the bailiffs, by permitting the plaintiff to connect his drain with one sewer,

should thereby preclude themselves from disconnecting it when its use became a nuisance. The defendant could not thus limit its power and defeat one of the purposes for which it was chartered."

*Id.* at 568–69, 29 A. at 1023–24. The Supreme Court of Wisconsin has similarly stated:

"Any license to connect with a municipal sewer system must at all times be contingent upon the ability of the system to dispose of the sewage. . . . No one has any vested rights in the use of the sewers, nor can a municipality grant such a vested right. If, for any reason, the system will not handle sewage from a particular source by reason of its nature or quantity, it is within the power of the municipality to require that the sewer connection be discontinued, and it may be the duty of the municipality to do so in order to protect itself from possible liability for the creation of a nuisance."

*Village of Menomonee Falls v. Michelson*, 104 Wis. 2d 137, 143, 311 N.W.2d 658, 661–62 (1981); *see also LaSalle Nat. Bank & Trust Co. v. City of Chicago*, 128 Ill. App. 3d 656, 665–66, 470 N.E.2d 1239, 1245–46 (1984) ("As a general rule, a permit to connect to municipal sewers is in the nature of a license only; it does not create a vested right to such connection;" court found irrelevant to plaintiff's claim that much time had passed and much money had been spent on sewer connection); *Baker v. Princeton*, 226 Ky. 409, 411, 11 S.W.2d 94, 95 (1928) ("The mere right to tap a sewer system in consideration of a specified fee is simply a temporary privilege which must yield when it becomes necessary to discontinue the old system, and construct a new system in order to promote the public health"); *Blue Fox Bar, Inc. v. City of Yankton*, 424 N.W.2d 915, 919 (S.D. 1988) ("This court has stated that no one has any vested rights in the use of sewers nor can the city grant such a vested right").

■■ In view of this weight of authority and sound reasoning, we also hold that a property owner has no vested right in a sewer connection. The plaintiffs' attempt to distinguish the above-cited cases because each involved one sewer line and not an entire municipal sewer system requires little comment. A property owner does not gain a vested right in a sewer system simply because the neighbors are similarly situated. In the absence of a property right, no taking for purposes of part I, article 12 of the State Constitution has occurred, *see LaSalle Nat. Bank & Trust v. City of Chicago, supra* at

664–65, 470 N.E.2d at 1245, and we therefore reverse the trial court's finding of inverse condemnation.

We next address the plaintiffs' third argument on appeal, that the selectmen lacked authority to expend money from the capital reserve fund to construct septic systems for Town-owned buildings. As related above, the Town voted to construct these septic systems, but never voted on a specific appropriation to pay for the construction. Instead, the Town voted to name the selectmen "as agents to expend the capital reserve fund for the purpose for which said fund was established." The stated purpose is "designing and constructing a sewage disposal system, or systems for the Monroe village sewer system that complies with federal and State law and regulations." The plaintiffs argue, first, that the expenditure for Town-owned buildings does not fall within the purpose of the capital reserve fund and, second, that the selectmen could not lawfully spend the funds without a specific appropriation voted at a town meeting.

We hold that the expenditure falls well within the purpose of the capital reserve fund because designing and constructing septic systems for Town-owned buildings (located within the village area) constitutes "designing and constructing a sewage disposal system . . . for the Monroe village sewer system." The plaintiffs make no argument to support their bald assertion that the expenditure does not fit the intended purpose, and we are unable to conjure one. We note that the selectmen did not expend the capital reserve funds to construct septic systems for Town-owned buildings until after a majority of the townspeople voted to construct such septic systems.

We also hold that the selectmen possess sufficient authority to spend money from the capital reserve fund by virtue of both their designation as agents to spend the money and the provisions of RSA 35:15. This statute states:

> "Persons holding said capital reserve funds in trust, as provided in this chapter, shall hold the same until such time as the town . . . in the manner prescribed by RSA 35:3, shall have named trustees or agents of the town . . . to carry out the objects designated by the town . . . provided that expenditures from any fund established for the acquisition of land pursuant to RSA 35:1 shall be made only as authorized by a majority vote of the legal voters present and voting at an annual meeting . . . . Expenditures from a capital reserve fund shall be made only for or in connection with the purposes for which said fund was established or as amended as provided in RSA 35:16."

The plaintiffs do not allege that the expenditures for constructing the septic systems for the Town-owned buildings involved the purchase of land. Nor do they argue that the Town failed to name the selectmen as agents in the manner prescribed by RSA 35:3. Because the Town plainly voted to name the selectmen as agents of the Town to carry out the objects designated by the Town, we hold that, once the Town voted to design and construct the septic systems for the Town-owned buildings, the selectmen possessed sufficient authority to spend money from the capital reserve fund to pay for this project.

The final issue we must wrestle with is that of attorney's fees. The trial court found "no bad faith by the plaintiffs such that attorney's fees are justified. The claims argued by the plaintiffs and their actions in pursuing them were not unreasonable." The defendants argue that the trial court should have awarded them attorney's fees at least for the defense of the plaintiffs' suit against the selectmen as individuals, *see* RSA 31:104 (municipal officials immune from civil suit as individuals for actions undertaken in official capacity, absent showing of bad faith), because the plaintiffs' assertion that the selectmen acted in bad faith had no reasonable basis in fact. "There was no evidence presented to prove bad faith," the defendants claim in their brief, "nor were there any provable allegations of fact to support a claim of bad faith." Specifically, the defendants argue that, while the plaintiffs made many claims that the selectmen acted wrongfully or illegally, they made no allegation that the selectmen acted with malice or with evil intent, an essential component of "bad faith." *See Murphy v. Financial Development Corp.*, 126 N.H. 536, 542, 495 A.2d 1245, 1250 (1985) (bad faith defined as "intentional disregard of duty or an intent to injure").

In evaluating the trial court's ruling on this issue, we must first keep in mind the tremendous deference given to a lower court's decision on attorney's fees. *See Maguire v. Merrimack Mut. Ins. Co.*, 133 N.H. 51, 54–55, 573 A.2d 451, 453–54 (1990). Next, we turn to the established law controlling the subject. The general rule in this State is that each party to a lawsuit is responsible for payment of his or her own lawyer's bill. *See Silva v. Botsch*, 121 N.H. 1041, 1043, 437 A.2d 313, 314 (1981). We have recognized exceptions to this rule "'where an individual is forced to seek judicial assistance to secure a clearly defined right' if bad faith can be established," *Funtown v. Town of Conway*, 127 N.H. 312, 315, 499 A.2d 1337, 1339 (1985) (quoting *Harkeem v. Adams*, 117 N.H. 687, 691, 377 A.2d 617, 619 (1977)); *see also Indian Head National Bank v. Corey*, 129 N.H. 83, 88, 523 A.2d 70, 73 (1986); "where litigation is instituted or unnecessarily pro-

longed through a party's oppressive, vexatious, arbitrary, capricious or bad faith conduct," *St. Germain v. Adams*, 117 N.H. 659, 662, 377 A.2d 620, 623 (1977); as "compensation for those who are forced to litigate in order to enjoy what a court has already decreed," *Keenan v. Fearon*, 130 N.H. 494, 502, 543 A.2d 1379, 1383 (1988); *see Indian Head National Bank v. Corey, supra* at 86, 523 A.2d at 72; and "for those who are forced to litigate against an opponent whose position is patently unreasonable," *Keenan v. Fearon supra.*

> "Thus we have recognized a constitutionally created court's power to award counsel fees in any action commenced, prolonged, required or defended without any reasonable basis in the facts provable by evidence, or any reasonable claim in the law as it is, or as it might arguably be held to be."

*Keenan v. Fearon supra.*

Applying these standards to the case before us, and keeping in mind the deference we must accord the trial court, we cannot say that the court's decision was in error. Even assuming that the plaintiffs failed to explicitly allege malice or evil intent on the part of the selectmen, we are not aware of a holding by this court, or any other, that allows an award of attorney's fees merely because a party fails to properly plead every element of a claim. The proper remedy for such unartful pleading is a dismissal of the claim, not payment of attorney's fees. *See* R. WIEBUSCH, 4 NEW HAMPSHIRE PRACTICE, CIVIL PRACTICE AND PROCEDURE §§ 346, 353(a), at 245, 247 (1984). Attorney's fees can only be awarded when the claim has "no reasonable basis in the facts provable by evidence, or . . . in the law as it is, or as it might arguably be held to be." *Keenan v. Fearon supra.* We think that the trial court could have properly reviewed the plaintiffs' several requests for findings of fact, alleging specific wrongful, illegal actions on the part of the selectmen, noted the heading "Bad Faith" preceding these requests, and correctly determined that "[t]he claims argued by the plaintiffs . . . were not unreasonable," even if ultimately decided against them. Moreover, some of the plaintiffs' requests alleged that the selectmen exceeded their statutory authority by expending the capital reserve fund to construct septic systems for Town-owned buildings. If the plaintiffs had persuaded us that this allegation was true, they would have established a colorable claim that the selectmen were not "acting in [their] official capacity in good faith and within the scope of [their] authority." RSA 31:104. Although the plaintiffs' position did not carry the day, as discussed

above, resolution of the issue turned on a fine question of law never before answered by this court. We therefore cannot hold that the plaintiffs' claim lacked any "reasonable basis in the facts provable by evidence, or . . . in the law as it is, or as it might arguably be held to be." *Keenan v. Fearon supra*. We affirm the trial court's denial of attorney's fees for the defendants.

> *Affirmed in part; reversed and remanded in part.*

All concurred.