Coakley Landfill Group v. IT Corp.    CV-98-167-JM 02/18/00    P

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**


The Coakley Landfill Group

    v.                                    Civil No. 98-167-JM
                                       Opinion No. 2000 DNH 045

IT Corporation

**O R D E R**

In the above-captioned diversity action, the Coakley

Landfill Group alleges that defendant IT Corporation breached its

contract to provide environmental remediation of the Coakley

Landfill and violated New Hampshire Revised Statutes Annotated

(RSA) 358-A.  IT subsequently filed a third-party complaint

against members of the Coakley Group alleging breach of contract,

wrongful termination, and violation of RSA 358-A.  Currently

before the court is IT's Motion for Partial Summary Judgment to

which the Coakley Group objects.  For the reasons that follow,

the court grants IT's motion.

Background

In 1992, the United States and the State of New Hampshire

filed an action under §§ 106 and 107 of the Comprehensive

Environmental Response Compensation and Liability Act (CERCLA) against several municipalities and businesses allegedly responsible for contamination of the Coakley Landfill. The group of potentially responsible parties, who became known as the Coakley Landfill Group, entered a consent decree, which required them to implement the clean up of the site. The Group selected IT as the remedial contractor to perform the work required by the consent decree.

On July 26, 1996 the Group and IT entered into an agreement describing the terms and conditions of the project. According to this agreement, the Group would pay IT $4,808,766.40 to complete the project.[1] According to plaintiff, IT initially agreed to have the landfill project completed by October 7, 1997. At IT's request, this deadline was extended to October 31, 1997. As of that date, IT had not completed construction of the project.

According to the agreement, the Group could terminate IT's services if it was dissatisfied with the work performed by IT.

---

[1]The Group admits that this was the original contract price for the project but alleges that this price was subsequently adjusted to $4,625,196.40.

2

See Environmental Remediation Contractor Agreement, Article 19.2.

If the Group terminated the contract, the agreement provided

that:

the Contractor shall not be entitled to receive any further payment until the Work is finished. If, upon completion of the Work, the unpaid balance of the Contract Price exceeds all claims, costs, losses and damages sustained by the Group arising out of or resulting from completing the Work such excess will be paid to the Contractor.

Because of IT's alleged contract breaches, the Group

terminated the agreement in March of 1998 and filed a complaint

in state court, which was subsequently removed to this court.

Specifically, the Group alleges that IT repeatedly made

misrepresentations to the Group regarding IT's performance of

contractual obligations, failed to procure needed material for

the site, failed to employ competent personnel, and failed to

provide adequate oversight of the survey layout. According to

the Group, all of these alleged breaches resulted in IT's failure

to meet contractual deadlines. Up until the time that the Group

terminated IT, the Group had paid IT $1,130,544.07. In response

3

to the Group's suit, IT filed a third-party complaint[2] against individual members of the Coakley Group.

To complete the project, the Group hired another contractor, H.E. Sargent, Inc. Sargent completed the project in August of 1998. Based on the Group's response to interrogatories over a year ago, the cost to complete the project was $2,006,350.76. See IT's Motion for Partial Summary Judgment, Exhibit C, Response to Interrogatory No. 15.

## Discussion

### 1.   Standard of Review

The court may only grant a motion for summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

---

[2]In its amended complaint IT joined Golder, the project engineer selected by the Group to prepare the remedial design work plan and oversee remediation activities and SeaHill Construction, the principal supplier of sands and soils for the project as third party defendants.

4

Fed. R. Civ. P. 56(c). Accordingly, at this stage of the proceeding, the court does not weigh the evidence and determine the truth of the matter but instead determines whether there is a genuine issue of fact for trial. See Stone & Michaud Ins. Bank Five for Savings, 785 F. Supp. 1065, 1068 (D.N.H. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). The substantive law identifies which facts are material so that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Caputo v. Boston Edison Co., 924 F.2d 11, 12-13 (1st Cir. 1991) (quoting Anderson, 477 U.S. at 248).

The party seeking summary judgment bears the initial burden of establishing the lack of genuine issues of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 227-28 (1st Cir. 1992). As a result, the court must view the entire record in the light most favorable to the non-moving party, "'indulging all

5

reasonable inferences in that party's favor.'" Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)). However, once a defendant has submitted a properly supported motion for summary judgment, the plaintiff "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256.

## 2.   Article 19.2 of the Agreement

In its motion, IT contends that the Group breached Article 19.2 of the agreement between IT and the Group. In support of this claim IT alleges that (1) the adjusted contract price was $4,808,766.40, (2) IT has only been paid $1,130,549.07, (3) the project has been completed, and (4) the Group's cost to complete the project was $2,006,350.76. Thus, IT alleges that the Group is bound, according to Article 19.2 of the agreement, to pay IT $1,671,871.41--the difference between the contract price, the payment IT has already received, and the Group's cost to complete the project.

a.   Claimed Attorneys' Fees.

The Group contends that summary judgment is not appropriate at this time because of attorneys' fees which it seeks to recover.

The New Hampshire Supreme Court has consistently stated that "the general rule in this State is that each party to a lawsuit is responsible for payment of his or her own lawyer's bill." Adams v. Bradshaw, 135 N.H. 7, 16 (1991) (citation omitted).  "An award of attorney's fees is the exception rather than the rule and requires 'statutory authorization, an agreement between the parties, or an established exception.'" Flanagan v. Prudhomme, 138 N.H. 561, 576 (1994) (citation omitted).  The Group relies on both the agreement and statutory exceptions.

(i) Agreement for Attorneys' Fees

First, the Group argues that Article 19.2 should be interpreted broadly to include attorneys' fees within the Group's costs for completing the project.  Because the Group's attorneys' fees are still accruing with this action, the Group asserts that its costs for completing the project cannot be determined.  Thus,

7

the Group contends that there is a genuine issue of fact as to how much, if any, money IT is entitled to under Article 19.2.

The meaning of language in an agreement is a question of law for the court to determine. See Miller v. Miller, 133 N.H. 587, 590, 578 A.2d 872, 873 (1990) (citations omitted). In interpreting a contract the court is to consider the written agreement, all its provisions, its subject matter, the situation of the parties at the time it was entered into and the object intended. See Commercial Union Assurance Co. v. Brown Co., 120 N.H. 620, 623, 419 A.2d 1111, 1113 (1980)(citation omitted). The starting point, therefore, is the contract language itself. See Parkhurst v. Gibson, 133 N.H. 57, 62 (1990)(absent fraud, duress, mutual mistake or ambiguity, parties' intent gleaned from words in contract). The language used is to be given its reasonable meaning and is to be construed in the context of the agreement as a whole. See Keshishian v. CMC Radiologists, 142 N.H. 168, 177, 698 A.2d 1228, 1234 (1997); Logic Assocs., Inc. v. Time Share Corp., 124 N.H. 565, 572, 474 A.2d 1006, 1010 (1984).

The court begins its analysis by considering whether a

8

reasonable interpretation of Article 19.2 includes attorneys' fees as part of the costs associated with completing the landfill project. According to Article 19.2, if the project is completed and "the unpaid balance of the Contract Price exceeds all claims, costs, losses and damages sustained by the Group arising out of or resulting from completing the Work such excess will be paid to the Contractor." Environmental Remediation Contractor Agreement, Article 19.2. It is evident that Article 19.2 does not expressly provide for attorneys' fees. In fact, Article 19.2 does not reference or mention legal action by either party against each other. Instead, it is clear that Article 19.2 is concerned with aspects of completing the work in a termination situation--(1) by clarifying under what circumstances the Group may terminate the contract, (2) by clarifying how the project would be handled by the Group upon termination, and (3) by clarifying when and how much (if at all) the contractor would be paid upon termination. See id.

In sharp contrast to the language of Article 19.2 the contract contains another clause, which explicitly permits the

9

Group to recover attorneys' fees from the contractor for certain acts. See Environmental Remediation Contractor Agreement, Article 7.16. The language in this clause provides that IT will indemnify and defend the Group "from and against any and all losses, damages, fines, forfeitures, costs, penalties (including but not limited to Stipulated Penalties), liabilities and expenses (including but not limited to legal fees and reasonable costs of investigation), judgments, liens, causes of action, suits, claims or demands ... " Environmental Remediation Contractor Agreement, Article 7.16. In this clause it was clearly the parties' intent to include attorneys' fees as part of the expenses to be paid by IT.

Unlike the indemnity provision for attorneys' fees, the only costs specifically referred to in Article 19.2 are those costs that relate to the completion of the landfill project. Given the subject matter covered by Article 19.2 in the contract, the fact that it does not specifically refer to attorneys' fees in contrast to Article 7.16, and the sophistication of the parties to this contract, I conclude that where the parties intended to

include attorneys' fees within the Group's costs they did so expressly.

_____ I find that the language of Article 19.2 is clear and unambiguous. Thus, the court finds that Article 19.2 cannot be construed to include attorneys' fees within the costs to complete the landfill project. This interpretation "gives meaning and effect to all the language in that clause and appears to best reflect the intention of the parties when viewed in the context of the entire contract, the situation of the parties at the time, and the object intended." Commercial Union Assurance Co., 120 N.H. at 623 (citation omitted).

(ii) Claim for Attorneys' Fees Under
N.H. RSA 358-A

Not only does the Group assert the right to hold back any fees and damages it may recover under N.H. RSA 358-A from payments it owes under Article 19.2, it asserts that the 358-A claim precludes the entry of partial summary judgment. IT suggests that the Group's assertions are a smoke screen. If the Group is ultimately entitled to fees and damages under 358-A, it has nothing to do with Article 19.2.

11

The fact that the Group has claims which equal or exceed the IT claim under Article 19.2 does not mean that partial judgment is precluded.  See Chemetron Corporation v. Cervantes, 92 F.R.D. 26, 30 (D.P.R. 1981).  In the context of the IT claim under Article 19.2 the Group's claim is in the nature of a recoupment.  It is not necessary to fully adjudicate the Group's claims.  Furthermore, IT's "Reply" makes clear that it seeks nothing more than a partial summary judgment on "the narrow issue of the operation of Article 19.2 of the Contract."

The existence of the Group's RSA 358-A claim (and its other claims) is significant to a decision under Fed. R. Civ. P. 54(b) as to entry of final judgment, not to a decision as to summary judgment under Fed. R. Civ. P. 56.  This is further supported by Rule 56(d) which clearly recognizes that partial summary judgment "is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case."  Fed. R. Civ. P. 56(d) advisory committee' note.

(b)  Sum Due Under Article 19.2

Having determined that attorneys' fees are not included

12

within the Group's costs to complete the project and do not preclude partial summary judgment, the court now must determine whether any other issues of fact preclude IT's motion. As indicated in the Group's responses to interrogatories in December of 1998, IT offers the Groups' December 1998 answers to interrogatories to prove that the adjusted contract price was $4,808,766.40 and that the cost to complete the project was $2,006,350.76. The Group disputes its own answers to interrogatories through the affidavit of Daniel C. MacRitchie. According to this affidavit the adjusted contract price was $4,625,196.40, not $4,808,766.40 as set forth in the Group's interrogatory answer. In addition, the costs to complete the project and litigation fees have not been finalized. The Group asserts that although its costs to complete were $2,006,350.76 when it responded to interrogatories in December 1998, by February 1999 these costs had increased to $2,413,130.99. As of July 1999, MacRitchie avers that additional costs continue to

13

increase as additional invoices were still being received.[3]

Thus, the Group argues, with these amounts in dispute, summary

judgment is not appropriate.

Adequate disclosure during discovery is "consonant with the

federal courts' desire to 'make a trial less a game of blindman's

bluff and more a fair contest with the basic issues and facts

disclosed <u>to the fullest practical extent</u>.'"  <u>Thibeault v. Square</u>

<u>D Co.</u>, 960 F.2d 239, 244 (1st Cir. 1992) (quoting <u>United States</u>

<u>v. Procter & Gamble Co.</u>, 356 U.S. 677, 682 (1958)) (emphasis

added).  Thus, pursuant to Rule 26(e)(2),

> [a] party is under a duty to <u>seasonably</u> amend
> a prior response to an interrogatory . . . if
> the party learns that the response is in some
> material respect incomplete or incorrect and
> if the additional or corrective information
> has not otherwise been made known to the
> other parties during the discovery process or
> in writing.

(Emphasis added.)

The Group has failed to offer any explanation for its

_____

[3] How invoices could continue to be received eleven months
after completion of the work is not explained, assuming there
could be a credible explanation.

14

failure to amend its interrogatory answers seasonably. If one accepts the MacRitchie affidavit as true the Group knew by February 1999 that its interrogatory answer was wrong as to the cost to complete. MacRitchie baldly avers that two change orders reduced the contract price from the $4,808,766.40 amount asserted in the interrogatory. The Group provided no evidence of these change orders other than MacRitchie's bald assertion, no explanation for them, no explanation of when they occurred or why they were not revealed in the interrogatory and no amended answer to interrogatories. Since the work was completed by August 1998, it is certainly not clear why these alleged change orders were not known by the December 1998 interrogatory answers. The Group has not advised the court that its cost to complete answer has been amended to this date. At the very least "seasonably" as used in Rule 26(e)(2) must mean within three or four months of discovery. It cannot mean a year. The Group's failure to update is unexplained and unexcused.

The failure to supplement the interrogatory leaves a contradiction between the Group's answer to interrogatories and

15

its proffered affidavit.  Ordinarily the court does not, and should not, make credibility assessments in deciding summary judgment motions.  <u>Anderson</u>, 477 U.S. 255.  However, it has long been recognized that under certain circumstances an affidavit filed in opposition to a motion for summary judgment may be disregarded if it contradicts that party's prior testimony or admission.  See <u>Perma Research & Dev. Co. v. Singer Co.</u>, 410 F.2d 572, 578 (2d Cir. 1969) (party's deposition testimony contradicted by party's affidavit); <u>Jack v. Trans World Airlines, Inc.</u>, 854 F. Supp. 654, 659-660 (D.N.D. Cal. 1994) (party's interrogatories contradicted by own summary judgment affidavit); <u>Stefanik v. Friendly Ice Cream Corporation</u>, 183 F.R.D. 52, 53-54 (D. Mass. 1998) (party's pleading averments contradicted by affidavit).

> "When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not offer a satisfactory explanation of why the testimony is changed." <u>Colantuoni v. Alfred Calcagni & Sons, Inc.</u>, 44 F.3d 1, 4-5 (1st cir. 1994)(citations omitted).

In other words, a party "is not permitted to kick over the chess

16

board in the face of a checkmate." Stefanik, 183 F.R.D. at 54. A satisfactory explanation for the change is necessary. Id.

Here, interrogatory answer no. 15 of December 1998 specifically stated that the "costs continue to increase, and are not the final damages amounts." The affidavit indicates that additional invoices were received as of February 1999 to bring the total costs to $2,413,130.99. The affidavit provides a sufficient explanation for the contradiction in costs of the project between the interrogatory answer of $2,006,350.76 and the affidavit statement of $2,413,130.99. The affidavit statement that as of July 1999 costs continued to accrue on this project completed a year before and where no such costs were shown to have been incurred from February 1999 through July 1999, provides no explanation, let alone a sufficient explanation, to find continuing costs. I find that there is no genuine issue of material fact that the costs to complete under Article 29.2 do not exceed $2,413,130.99.

Interrogatory answer no. 24 states that the current Contract Price is $4,808,766.40. By the date of that answer the project

17

had been completed for four months. Article 11 permits deletions from the work but requires the Group to issue Change Orders or Work Change Directives for any such deletions so that the Contractor can promptly proceed. The work ended in August 1998. The affidavit provides absolutely no explanation to show a discrepancy or mistake in the answer to interrogatory. It does not explain when the change orders occurred, what they particularly involved or how they could occur months after completion of the work. In fact, the affiant provides no explanation of the contradiction between the interrogatory and the affidavit. To the contrary, MacRitchie attacks IT's affiant for his statement of contract price, apparently blissfully ignorant of the fact that he was in reality seeking to contradict the Group's interrogatory answer. The affiant's function was to receive invoices and process them. ¶ 3, affid., document 33. There is no foundation for his assertion of the contract price evidenced in his affidavit, as opposed to the interrogatory answer of the Group, the party which certainly knew the contract price. The Group submitted as part of a motion to compel a

18

letter of its attorney to IT's attorney concerning the revised contract of value of $4,625,196.40. Document no. 54, Exhibit A. That letter makes it clear that the MacRitchie affidavit correctly states the Group's asserted contract value. It also makes it clear that, contrary to the MacRitchie affidavit, the revised number is not the result of two change orders but rather is the result of (1) the net of seven change orders, (2) the net of six work directives, (3) ten unit cost adjustments and (4) the deletion of paving. The lack of care given to accuracy in the affidavit or in assuring that the court is not mislead is obvious. It does not enhance a party's credibility to see a detailed letter of the party's attorneys sent twenty-three days after an affidavit which partially contradicts the affidavit filed with the court which partially contradicts the unamended interrogatories.

The explanation of the interrogatory/affidavit contradiction is barely sufficient, but recognizing the importance of avoiding credibility determinations in summary judgment determinations, I find that there is no genuine issue of fact that the contract

19

price is not less than $4,625,196.40.

If IT believes that it incurred attorneys' fees and costs due to the Group's failure to seasonably amend its interrogatory answers, IT should file a motion for sanctions and I will issue a show cause order.

## Conclusion

For the foregoing reasons, IT's motion for partial summary judgment (document no. 22) is granted in part. Under Article 29.2 the contract price is not less than $4,625,196.40 and the costs to complete to be deducted from that sum is no greater than $2,413,130.99. The sums paid to IT before termination totaled $1,130,544.07. Pursuant to the provisions of Article 29.2 IT has a contractual right to be paid $1,081,521.34.

**SO ORDERED.**

_____
James R. Muirhead
United States Magistrate Judge

Date: February 18, 2000

cc:    George R. Moore, Esq.
       Jeremy Ritzenberg, Esq.
       James C. Wheat, Esq.
       Patrick A. Thompson, Esq.

C. Kevin Leonard, Esq.
Paul M. Monzione, Esq.