Carroll
No. 90-603

CHARLES H. SMITH & a.

v.

TOWN OF WOLFEBORO & a.

November 10, 1992

*Walker & Varney*, of Wolfeboro, and *Elizabeth Cazden*, of Manchester (*Robert C. Varney* and *Ms. Cazden* on the brief, and *Mr. Varney* orally), for the plaintiffs.

*Barto & Puffer, P.A.*, of Concord (*John W. Barto* on the brief and orally), for the defendants.

*Timothy Bates*, of Concord, by brief for the New Hampshire Municipal Association, as *amicus curiae*.

JOHNSON, J.   The Town of Wolfeboro (the town) and the Wolfeboro Planning Board (the board) appeal from a decision of the Superior Court (*Temple*, J.) involving a subdivision owned by Charles H. Smith and Richard D. Kourian (the owners). The court reversed the

board's decision to reconfigure lot 3 in the owners' subdivision and to deny the owners' application for certification of lot 3 as suitable for residential development. The court awarded damages for a temporary taking but denied the owners' request for attorney's fees. The owners cross appeal for an award of fees. We reverse the superior court's award of damages, but affirm the court's order in all other respects.

Smith and Kourian are owners and developers of Embassy Estates, a 44-lot subdivision in Wolfeboro on the shores of Lake Winnipesaukee. On October 6, 1987, the board approved for residential use forty-one out of forty-four lots in the owners' subdivision. The board placed restrictions on lots 1, 2, and 3, restricting them against residential use, but granted the right to reopen the issue of the "suitability" of those lots for residential use at any time, under the subdivision regulations in effect on July 20, 1987.

After the subdivision was approved, the town taxed lots 1, 2, and 3 as separate lots at assessed values comparable to buildable lots in the subdivision. The lots are shown separately on a plan recorded at the registry of deeds and on Wolfeboro's official plat.

In preparation for reopening the issue of suitability, the owners obtained permission from the New Hampshire Water Supply and Pollution Control Division (WSPCD) to install individual septic disposal systems on lots 1, 2, and 3.

In March 1988, the town amended its zoning ordinance to increase setback requirements. The amended ordinance did not apply to "lots of record" as of March 8, 1988.

In September 1988, the owners applied to the board to reopen the issue of the suitability of lots 1, 2, and 3 for residential use, and to remove the restrictions the board had placed on the lots. At that time, the owners submitted to the board three individual septic system designs which had been approved by the WSPCD, and which showed the location of the septic tank and leach fields on each lot.

The board held two hearings on the matter, and ultimately voted to deny the owners' request that the board declare lot 3 suitable for development. Immediately thereafter, the chairman of the board read aloud the following previously prepared motion:

> "The motion is that Lot 3 on a plan of Lots 1, 2 and 3 of Embassy Estates, prepared for Charles H. Smith and Richard D. Kourian presented by White Mountain Survey Co., Inc., to the Planning Board on October 18, 1988, be enlarged by the addition of a portion of Lot 2, lying between Lot 3 and

a line beginning at a disk set at the shore of Lake Winnipesaukee at the boundary of Lots 1 and 2 and running southwesterly to a point on the east side of the 50 foot right of way of Hopewell Point on said plan at the boundary of Lots 2 and 3, *and that Lot 3 as enlarged is approved for residential use.* A reference to this motion and date is to be placed on the plan and copies for signature and recorded by the Board and to be presented to the planning office. Changes in dimensions and areas of Lots 2 and 3 are to be on the plans."

(Emphasis added.) The motion was amended to add "Lots 1 and 2 shall remain restricted against residential use." The owners objected to the board's unexpected motion to alter the original boundaries of lots 2 and 3, without any prior notice to the owners. The board, however, voted to approve the amended motion. The effect of the enlargement of lot 3 was to transfer all of lot 2's lake frontage to lot 3, to deprive lot 2 of most of its better-drained soil, and to make lot 2 nonconforming in terms of lot size and frontage requirements, which guaranteed that it could not be developed.

The owners appealed the board's decision to the superior court pursuant to RSA 677:15, I (1986) (amended 1991), alleging that the board's decision was illegal and unreasonable. The board advanced two reasons for its decision: (1) the board was concerned with the possible existence of a private right-of-way across lots 1, 2, and 3; and (2) the board felt the proposed septic systems were inadequate.

The trial court rejected both reasons and reversed the board's decision not to remove the restrictions which prevented development of lot 3. It remanded to the board the issue of lot 2's restrictions, and no appeal was taken from that part of the court's order. The owners removed lot 1 from the case at the beginning of trial. Therefore, lot 3 is the only lot involved in this appeal.

In June 1989, the owners entered into a purchase and sale agreement for lots 2 and 3 for $933,000. The agreement was conditioned upon the buyer's ability to obtain a building permit. The permit was denied because of the board's refusal to lift the conditions placed on the lots as set forth above.

The trial court found that $466,500 was a reasonable price for lot 3 in June 1989, but that by the time of trial, the fair market value of lot 3 had dropped to $330,000. The court held that the board had effected a "taking" by its unreasonable decision, and awarded the owners $136,500 as compensation for the temporary taking of their right to develop their property.

*I. Right-of-Way*

The town concedes that a determination of the status of the alleged right-of-way was not within the board's jurisdiction. *Short v. Town of Rye*, 121 N.H. 415, 416, 430 A.2d 183, 184–85 (1981). However, the town argues that the board was permitted to rely on the uncertainty surrounding the right-of-way as a basis for denying the owners' application.

■ We need not decide whether the planning board may rely upon uncertainty regarding a possible encumbrance upon a lot, because in this case the trial court specifically found that lot 3 "was a suitable lot for residential use." The trial court concluded: "Thus, it was unreasonable for the Board to deny the plaintiffs' request to remove the restriction on Lot 3 prohibiting residential use." The record sustains these findings.

*II. Zoning Regulations*

The town argues that the matter of setbacks was not properly before the board and, therefore, that the trial court improperly decided that lots 1, 2, and 3 were lots of record as of October 6, 1987, so as to be exempted from the March 1988 amended zoning ordinance.

■ We find that the issue of which setback requirement applied was properly before the board and trial court. Section IV, paragraph R of the Wolfeboro Subdivision Regulations dictates that each "proposed subdivision shall conform" to local planning and zoning ordinances. The board's evaluation of the owners' proposal could not proceed without a preliminary determination of how far the proposed septic systems and houses had to be set back. The board assumed that the amended 1988 setback requirements applied, pursuant to an opinion of counsel, and reconfigured the lot boundaries in part on that basis. Implicit in the board's decision was the determination that lots 1, 2, and 3 were not "lots of record" as of March 1988.

■ We will uphold the decision of the trial court unless it is unsupported by the evidence or is legally erroneous. *K & P, Inc. v. Town of Plaistow*, 133 N.H. 283, 289, 575 A.2d 804, 808 (1990). The trial court found that lots 1, 2, and 3 were separate "lots of record" within the meaning of Section V, paragraph A of the Wolfeboro Zoning Ordinance, which states that "[i]n case of a lot of record or dwelling unit existing as of March 8, 1988," front setbacks are only thirty feet, and side and rear setbacks only ten feet. In support of the trial

court's findings, the owners note that the subdivision plan recorded at the Carroll County Registry of Deeds shows forty-four separate lots, and that the town taxed lots 1, 2, and 3 separately after the October 1987 subdivision approval.

■ The town argues that "lot of record" should be read to mean "lot of record usable for residential purposes." We find that the trial court's decision with respect to the grandfathering of the lots was both legally correct and reasonable. The town has presented no evidence or argument that would persuade us to read into the ordinance the additional requirement it suggests. Moreover, even if we did accept the town's argument, we find that lots 1, 2, and 3 were "usable" for residential purposes in March 1988. The lots were zoned for single-family residential use and, therefore, they were usable for residential purposes. Obtaining the board's approval, like getting a building permit, was merely one of the steps to be taken in preparation for development.

*III. Septic Systems*

■ The town argues that the proposed septic system design on lot 3 is inadequate to protect public health and safety, despite the WSPCD's approval of the system. The town correctly cites *Durant v. Town of Dunbarton*, 121 N.H. 352, 430 A.2d 140 (1981), for the proposition that a "planning board is entitled to rely in part on its own judgment and experience in acting upon applications for subdivision approval." *Id.* at 357, 430 A.2d at 144. A planning board is not bound by a determination of another agency, such as the WSPCD, and is free to enact more exacting or protective standards.

In this case, however, there are no local standards to guide applicants as to what, beyond WSPCD approval, is required for septic system approval. Section IV, paragraph B of the Wolfeboro Subdivision Regulations authorizes the board to disapprove a plan for "land of such character as cannot be safely used for building purposes because of exceptional danger to health or peril from fire, flood or other menace . . . until appropriate measures have been taken by the owner or his [or her] agent to lessen such hazards." Paragraph F provides:

> "That in areas not currently served by public sewer systems it is the responsibility of the subdivider to provide adequate information to prove that the area of each lot is adequate to permit the installation and operation of an individual sewage disposal system . . . . Such information may consist of the report of . . . the State Water Supply and Pollution Control [Division] . . . ."

Therefore, although the developer has the initial burden of proving adequate sewage disposal, there is a presumption under this regulation that WSPCD approval of an on-site sewage system is adequate proof of a safe septic system. Once the owners produced the WSPCD's report, the lots should have been approved, in the absence of other evidence that the septic systems still posed an "exceptional danger to health."

With respect to the health threat from the septic systems, the board relied primarily on a memo from the board's chairman, who is not qualified in the record as an expert, that nitrates and phosphates not oxidized by septic systems are the most important sources of lake pollution, and that a septic system designed with swales, which the owners' system apparently lacked, is more effective in removing those pollutants from the effluent. The board also relied on testimony that had been provided by one of the owners' experts in a prior, unrelated proceeding before the board.

■ The board's concerns about lake pollution are legitimate. The town is free to pass ordinances setting higher septic system standards than WSPCD currently requires. See RSA 485-A:32, I. However, the board may not deny subdivision approval on an *ad hoc* basis because of vague concerns. See *Barrington East Owners' Assoc. v. Town of Barrington*, 121 N.H. 627, 631, 433 A.2d 1266, 1268 (1981) (board's decision must be based on more than mere personal opinions of its members). Under the Wolfeboro Subdivision Regulations in place at the time of the board's decision, the only basis for denying approval because of inadequate sewage disposal was a showing that the proposed septic system posed an "exceptional danger to health." The board apparently based its decision on its belief that there existed a septic system superior to the one the owners proposed, despite the absence of testimony that the proposed system posed an "exceptional danger to health."

However, the fact most damaging to the town's argument is that it *did* approve lot 3's septic system and its "residential use" on the condition that a portion of lot 2 be appended to lot 3. The reconfiguration of lot 3's border did nothing to alter the proposed septic system or lessen the hazard therefrom. The board did not require any change of design or location of lot 3's septic system. Therefore, we must conclude that the board did not find that the septic system on lot 3 posed an "exceptional danger to health."

■ We conclude that the board had no valid basis for denying the owners' motion to declare lot 3 suitable for residential development,

and the board should have removed the restrictions it placed on the lot in 1987.

*IV. Taking*

A "taking" occurs when the application of a regulation to a particular parcel denies the owner an economically viable use of his or her land. *Buskey v. Town of Hanover*, 133 N.H. 318, 322, 577 A.2d 406, 409 (1990). Although the board's decision did not permanently deprive the owners of a right to develop their land, it could nevertheless be compensable if it effected a "temporary taking." *See First Lutheran Church v. Los Angeles County*, 482 U.S. 304, 318 (1987).

"Reasonable regulations that prevent an owner from using his [or her] land in such a way that it causes injury to others or deprives them of the reasonable use of their land may not require compensation." *Burrows v. City of Keene*, 121 N.H. 590, 598, 432 A.2d 15, 19 (1981). However, "arbitrary or unreasonable restrictions which substantially deprive the owner of the economically viable use of his [or her] land in order to benefit the public . . . constitute a taking within the meaning of [the] New Hampshire Constitution." *Id.* at 598, 432 A.2d at 20 (quotation omitted).

The trial court relied solely on *Burrows* as authority for its decision that a compensable taking had occurred. However, *Burrows* involved facts materially different from those in this case. *Burrows* presented a facial challenge to a zoning ordinance that had been amended to place the plaintiffs' land permanently in a conservation zone, thereby securing a public benefit. Here, the owners have not challenged the constitutionality of the Wolfeboro Subdivision Regulations, and we do not find the applicable regulations to be arbitrary or unreasonable. The applicable provision of the Wolfeboro regulations authorizes the board to deny subdivision approval for lots that pose an "exceptional danger to health." This regulation is rationally related to the protection of public health and deprives landowners of no reasonable uses of their land. We find no constitutional defect in a regulation that seeks to prevent development which poses an "exceptional danger to health." Such a regulation would not exceed tort and property law restrictions even if it were applied to deprive an owner of all economically viable use of his or her land. *See Lucas v. South Carolina Coastal Council*, — U.S. —, —, 112 S. Ct. 2886, 2901 (1992). Even in the absence of State regulation, no landowner has the right to use his or her property so as to injure others. *See Bassett v. Company*, 43 N.H. 569, 577 (1862).

Although the board improperly applied the pertinent ordinance in this case, its error does not amount to a taking. An erroneous planning board decision based on sound authority must be distinguished from the application of an invalid regulation. An appeal of a mistaken board decision is an element of the governmental decision making process under RSA 677:15 (amended 1991). A declaration that an ordinance is unconstitutional is an extraordinary measure, designed to rectify a conclusory act of rule making that stripped a property owner of his or her rights. The owners' assertion that they have a vested, compensable right to a reasonable decision by the planning board is accordingly incorrect. A property owner has the right to petition the trial court to review and reverse planning board decisions, pursuant to RSA 677:15. The owners have successfully exercised that option, and that is their sole remedy.

"Mere fluctuations in value during the process of governmental decision making, absent extraordinary delay, are incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense." *Agins v. Tiburon*, 447 U.S. 255, 263 n.9 (1980) (quotation omitted). The delay inherent in the statutory process of obtaining subdivision approval, including appeals to the superior court and to this court, is one of the incidents of ownership. Any decrease in the value of the subject property that occurs during the pendency of governmental decision making must be borne by the property owner and does not give rise to a compensable taking. Consequently, we hold that the award of compensation to the owners was improper, and we reverse the trial court.

## V. Attorney's Fees

Finally, the owners cross appeal the trial court's denial of attorney's fees. RSA 677:15, V provides that "[c]osts shall not be allowed against the municipality unless it shall appear to the court that the planning board acted in bad faith or with malice in making the decision appealed from." The trial court assumed that awarding attorney's fees as well as costs requires a finding of bad faith. The court found that the board had not acted in bad faith or with malice, and that the owners had not alleged bad faith in their complaint. We uphold the trial court's findings of fact unless they are not supported by the evidence or are erroneous as a matter of law. *In re Certain Scholarship Funds*, 133 N.H. 227, 232, 575 A.2d 1325, 1328 (1990). The record amply supports the trial court's findings.

The owners argue that attorney's fees should be awarded even in the absence of bad faith. Assuming that RSA 677:15, V does

not affect the court's power to award attorney's fees, *cf. Silva v. Botsch*, 121 N.H. 1041, 1044, 437 A.2d 313, 315 (1981) (finding that "costs" as defined in RSA chapters 490 and 525 do not include attorney's fees), we find nevertheless that an award of fees is inappropriate. The American rule is that each party bears its own attorney's fees. *Id.* at 1043, 437 A.2d at 314. The owners cite *Dugas v. Town of Conway*, 125 N.H. 175, 480 A.2d 71 (1984), for an exception to the American rule that may entitle a claimant to an award of fees: "[A] citizen should not be compelled to bear the financial burden of judicial intervention to secure his [or her] clearly defined and established property right from an unconstitutional abuse of power found to constitute a taking." *Id.* at 183, 480 A.2d at 76.

The owners' case does not satisfy the *Dugas* criteria, however. The proceedings before the board were a required step in the process of clarifying the owners' right to develop and dispose of lot 3 for residential purposes. The owners' rights were not clearly defined and established before the process culminated in this appeal. In *Dugas*, we were concerned not merely "with the erroneous application of a valid zoning regulation," but with the enactment and application of a flagrantly unconstitutional ordinance, "upon which there [was] no valid issue of conflict." *Id.* Here we have found the board's decision mistaken, but we have not found an *"unconstitutional taking of vested property rights"* such as that which moved the *Dugas* court. *Id.* at 182, 480 A.2d at 76. The principle announced in *Dugas* is thus inapplicable to the owners' claim, and no other grounds for awarding fees are relevant. *See Adams v. Bradshaw*, 135 N.H. 7, 16–17, 599 A.2d 481, 487–88 (1991), *cert. denied,* — U.S. —, 112 S. Ct. 1560 (1992); Doleac, *Court Awarded Attorneys Fees Under New Hampshire Common Law*, 17 N.H.B.J. 134 (1976); Douglas, *Statutory Authorization for Attorney's Fees in New Hampshire*, 17 N.H.B.J. 205 (1976). In the absence of a pertinent exception to the American rule and given the lack of bad faith or malice, we hold that the trial court properly found that the owners must bear the expense of appealing the board's erroneous decision.

*Affirmed in part; reversed in part.*

All concurred.