Rockingham
No. 2007-569

DERRY SENIOR DEVELOPMENT, LLC

v.

TOWN OF DERRY

Argued: April 30, 2008
Opinion Issued: July 2, 2008

*Getman, Stacey, Schulthess & Steere, P.A.*, of Bedford (*Andrew R. Schulman* on the brief and orally), for the plaintiff.

*Boutin & Altieri, P.L.L.C.*, of Londonderry (*Steven A. Clark* on the brief and orally), for the defendant.

DUGGAN, J. The plaintiff, Derry Senior Development, LLC, appeals an order of the Trial Court (*Coffey*, J.) upholding the denial of its application for site plan approval of an independent adult community development in the Town of Derry (town) by the Town of Derry Planning Board (board). We hold that, because the New Hampshire Department of Environmental Services (DES) approved the plaintiff's proposed sewage disposal system, the town has enacted no standards more stringent than the DES standards, *see* N.H. ADMIN. RULES, Env-Ws 1000-1025 (1999) (amended and re-adopted as Env-Wq 1000-1025 (2008)), and the record reveals no evidence suggesting that the plaintiff's proposed system would not adequately protect all water supplies, the board unreasonably and unlawfully denied the plaintiff's application for site plan approval. Accordingly, we reverse and remand.

The plaintiff owns a sixty-acre parcel of land on Drew Road in Derry, located in the town's Low Density Residential District and its Independent Adult Community Overlay District. Under the town's zoning ordinance, an independent adult community is defined as "[a] residential development . . . with . . . dwellings limited to occupancy by households that each include at least one person age 55 or older . . . and [not including] any person age 18 years or younger for more than ninety days in any calendar year." DERRY, N.H., ZONING ORDINANCE art. XIX, § 165-146(2) (2005). In permitting the development of such communities, the town recognized, among other things, "that developments housing older persons typically generate lower average rates of vehicular traffic, water usage and sewer usage than other types of residential developments, and have less impact upon the public school system and a lower average number of residents per dwelling." *Id.* § 165-145(3). The ordinance mandates that any proposal for an independent adult community must "conform to the requirements of the Town of Derry Site Plan Regulations," *id.* § 165-151, and any applicant seeking to develop such a community must obtain approval from the board, *id.* §§ 165-145, 165-147.

On August 8, 2006, the plaintiff applied for final site plan approval to construct an independent adult community development on its property. The proposed project consisted of, among other things: (1) thirty-six two-bedroom single family detached residences, with "35 units to be located on a new private way to be called Kimball's Lane, [and] one additional unit to be accessed from Drew Road"; (2) six community septic systems, each with four-inch sewage collection pipes; (3) thirty-six individual water wells; and (4) approximately forty acres of open space.

Before submitting the application to the board, the plaintiff obtained approval for its project from, among other entities, the DES. *See generally* RSA ch. 485-A (2001 & Supp. 2007). The Town of Derry Department of Public Works (DPW), however, opposed the proposed development. It requested that: (1) Kimball Lane "be constructed to essentially subdivision standard (24 [feet] wide pavement, 4 [inch] pavement thickness)," not twenty feet wide and three inch thick pavement as proposed by the plaintiff; and (2) "all sewer collection system components upstream of the septic tank(s) . . . be built according to [the higher standards found in the] Town of Derry Sewer Division Regulations"; that is, "the collection system . . . be comprised of 8 [inch] sewer mains, 6 [inch] sewer services and precast concrete manholes at intersecting pipes or at the end of a sewer main," not, as the plaintiff proposed, "4 [inch] pipes with cleanouts."

The town's engineer also reviewed the application, and recommended, among other things, that: (1) Kimball Lane have a minimum width of twenty-four feet; and (2) "[a]lthough the content of the [septic system design] plans [wa]s statutorily within the purview of the NHDES, . . . all 'common' sewage collection lines be constructed of SDR 35 PVC, having a minimum diameter of six (6) inches for improved serviceability and performance."

On September 6, 2006, the board held a public hearing on the plaintiff's application for site plan review. At the hearing, several abutters testified that their wells already provided an insufficient supply of water, and that they were concerned that the proposed development would further reduce their water supply. In response, the board requested an independent hydrogeology study to examine the potential impact of the proposed development upon the water supply. Additionally, the board expressed concerns with, among other things, the width of Kimball Road and the community septic systems. Ultimately, the board accepted jurisdiction of the plaintiff's application because "it was a completed application," scheduled a site visit, and tabled consideration of the plan to a later date.

At a public hearing held on October 30, 2006, the plaintiff requested a continuance to December 6, 2006. After approving this request, the board discussed whether the plaintiff's application was subject to the town's site plan or subdivision regulations, and concluded that the site plan regulations applied.

Prior to the December 6, 2006 hearing, the plaintiff revised its plans to address various concerns of the town's engineer. It did not, however, submit revised plans to the board until the day before the hearing, and, at that time, submitted only one copy of the revised plans. Thus, at the December 6, 2006 hearing, the board considered the plaintiff's original application, not its revised plans.

At the hearing, the DPW reiterated that it required, among other things, that Kimball Lane be twenty-four feet wide, and that the sewer collection system be "buil[t] to town standards as required of the Indian Hill Estates," another independent adult community previously approved by the board. One board member, Tom Carrier, who is also the assistant director of the DPW, expressed support for the DPW's position. He stated:

> I think that to be clear here that the standards that we have been requiring, at least as my understanding, is not standards for the sake of standards. There is some thought and there is some logic behind them—you know, addressed in particular, the sewer construction standards, that for your understanding, we have had historically a number of problems with community septic systems. And, I would submit to you that just about every single community septic system constructed in the Town of Derry, particularly during the 1980's, failed. And, one of the primary reasons why they failed was due to the construction of the collection system. So, absent an existing regulation with regard to the Town, you're correct, the DES did, but DES is not specific when it comes to collection systems, they are dealing more with sub surface disposal system, that we apply the existing Town of Derry standards which we feel are well thought and defensible. With the road standards also that, again we believe that they're well thought and defensible, so they're not just standards for the sake of standards. I intend on not supporting approval of this development because it does not meet the design and construction standards of the Land Development Control Regulations specifically with regard to internal access drives. There's one particular unit that has no access via the internal drive [Kimball Lane] as required, and it does not meet the 24 foot wide paving requirement.

Additionally, several abutters opposed the proposed development, expressing concerns that, among other things, the development would adversely affect their wells and water supply, and that the proposed septic system would be located up-gradient of their wells. As to the former concern, the board noted that the experts agreed that the proposed development, which would consist of thirty-six individual wells, would not have a measurable adverse impact upon the water supply yields in the area.

Following discussion, a board member moved to approve the plaintiff's original application, subject to several conditions. One condition required the plaintiff to comply with the recommendation by the town's engineer that the plaintiff use six-inch collection pipes for the sewage system.

Ultimately, the board denied the motion to approve the application, even with the stated conditions. Specifically, after acknowledging that the plan met DES requirements, the board voted to disapprove the application partly because the proposed sewage system did not have "larger piping to eliminate the failure that [the town previously] experienced" with community septic systems. In its certificate of disapproval, the board cited the following reasons for denial: (1) the plan did not comply with the town's regulation requiring internal drives to have a minimum width of twenty-four feet; (2) "[r]evised plans were not available for review"; and (3) "[t]here were 4 homes with wells that are down-gradient of a 12 unit septic system."

The plaintiff appealed to the superior court. *See* RSA 677:15 (Supp. 2007). The superior court affirmed, finding that the board's disapproval of the plaintiff's application was "supported by [the board's] determination that the sewage pipe design [wa]s inadequate to protect the health and safety of residents, particularly the four abutters whose wells are located down gradient of the septic site." The superior court, therefore, did not address the board's remaining reasons for denying the application.

On appeal, the plaintiff argues that the town has enacted "no site plan regulations that specifically address septic systems or septic set back requirements," and, "[t]herefore, DES approval should be *prima facie* proof that an applicant's design and setbacks are safe and sufficient." Because "there was no expert evidence which rebutted the presumption of safety and adequacy which should have been inferred from [its] certificate of DES approval," and because the board "effectively imposed a new *rule* which had never been proposed or adopted by the appropriate rule-making process," the plaintiff contends that "both the . . . [b]oard and the trial court committed an error of law by affording the DES approval less than presumptive weight, and acted unreasonably in denying plaintiff's application on the grounds that it included a community septic system up-gradient from four homes."

The town counters that, consistent with the purpose of the town's site plan regulations to "guard against such conditions as would involve danger or injury to health, safety, or prosperity," DERRY, N.H., LAND DEVELOPMENT CONTROL REGULATIONS, part 3, art. VII, § 170-47(A)(1) (2005) (LDCR), the board properly relied upon "the testimony and comments of . . . two individuals who are qualified in th[e] area" of septic systems in requiring larger piping. The town maintains that the "board's concerns were not *ad hoc* but were legitimate in light of the proposal and its experience with community septic systems," and that the board "had persuasive evidence before it that supported its denial of . . . the septic plan as designed." Thus, the town contends that the trial court properly upheld the board's denial of the application.

Our review of the trial court's decision is deferential. *Summa Humma Enters. v. Town of Tilton*, 151 N.H. 75, 79 (2004). We will uphold the decision on appeal unless it is unsupported by the evidence or legally erroneous. *Id.*

Superior court review of planning board decisions is equally limited. *Id.* The superior court is obligated to treat the factual findings of the planning board as *prima facie* lawful and reasonable and cannot set aside its decision absent unreasonableness or an identified error of law. *Id.* The appealing party bears the burden of demonstrating that, by the balance of the probabilities, the board's decision was unreasonable. *Id.* The review by the superior court is not to determine whether it agrees with the planning board's findings, but to determine whether there is evidence upon which they could have been reasonably based. *Id.*

■■ "Site plan review is designed to insure that uses permitted by a zoning ordinance are constructed on a site in such a way that they fit into the area in which they are being constructed without causing drainage, traffic, or lighting problems." *Id.* at 78 (quotation omitted). It is "also designed to assure that sites will be developed in a safe and attractive manner and in a way that will not involve danger or injury to the health, safety, or prosperity of abutting property owners or the general public." *Id.* (quotation omitted). To accomplish these purposes, a plan is "subject[ed] . . . to the very expertise expected of a planning board in cases where it would not be feasible to set forth in the ordinance a set of specific requirements upon which a building inspector could readily grant or refuse a permit." *Id.* (quotation omitted). The planning board "review[s] site plans to determine if they properly address such issues as surface and sanitary drainage, the effect on ground water, and the creation of pollution sources," 15 P. LOUGHLIN, NEW HAMPSHIRE PRACTICE, LAND USE PLANNING AND ZONING § 30.02, at 427 (2000), and, thus, has the authority "to impose requirements and conditions that are reasonably related to land use goals and considerations within its purview," *Summa Humma Enters.*, 151 N.H. at 78 (citations omitted).

■■ Although "[s]ite review can be an extremely useful and powerful tool for municipalities . . . , there are definite limits to its use." 15 P. LOUGHLIN, *supra* § 30.09, at 436; *see also Summa Humma Enters.*, 151 N.H. at 78. "For example, site plans may only be reviewed after the local legislative body has specifically authorized the planning board to exercise site plan control and only communities which have adopted valid zoning ordinances may grant site review control to their planning boards." 15 P. LOUGHLIN, *supra* § 30.09, at 436-37; *see* RSA 674:43, I (Supp. 2007). Further, "[s]ite review statutes are not self-executing, but rather, the local planning board must adopt specific site review regulations before exercis-

ing authority." 15 P. LOUGHLIN, *supra* § 30.09, at 437; *see* RSA 674:44, I (Supp. 2007); RSA 675:6 (1996) (setting forth method of adoption of site plan regulations). These regulations must, among other things, "[d]efine the purposes of site plan review" and "[s]pecify the general standards and requirements with which the proposed development shall comply, including appropriate reference to accepted codes and standards for construction." RSA 674:44, III(b), (c). The regulations that the planning board adopts may, among other things, "stipulate, as a condition precedent to the approval of the plat, the extent . . . to which water, sewer, and other utility mains, piping, connections, or other facilities shall be installed." RSA 674:44, IV.

Here, the board adopted site plan regulations pursuant to RSA 674:44, I. The stated purpose of these site plan regulations is to:

> [u]phold the purposes set forth in RSA 674:44, including to . . . guard against such conditions as would involve danger or injury to health, safety, or prosperity by reason of . . . inadequate protection for the quality of groundwater . . . [or] undesirable and preventable elements of pollution such as . . . particulates, or any other discharge into the environment which might prove harmful to persons, structures, or adjacent properties . . . ; and [i]nclude such provisions as will tend to create conditions favorable for health, safety, convenience, and prosperity.

LDCR §§ 170-47(A)(1), (8).

To achieve this purpose, the board enacted site plan regulations that set forth various design and construction standards, including standards for site access, parking, storm water management, and sewer construction. *See* LDCR §§ 170-62 to -65. The board, however, also reserved the right to "set higher requirements with regard to any standards in the[] regulations if, in the opinion of the Board, it is necessary to protect the health, safety or welfare of the community." *Id.* § 170-50(B).

Relevant to this case is a regulation governing "[s]anitary sewer construction," which provides, in pertinent part:

> In areas where municipal sewer is not available, an on-site subsurface sewage disposal system may be designed and constructed *as long as said design and construction fully complies with all applicable requirements of the New Hampshire Code of Administrative Rules; and the applicant has secured appropriate permits for the same from the [DES]*.

*Id.* § 170-66(A)(1) (emphasis added).

The New Hampshire Code of Administrative Rules sets forth comprehensive rules for the design of sewage disposal systems. *See* N.H. ADMIN. RULES, Env-Ws 1000-1025. The purpose of these rules is "to prevent pollution of all public or private water supplies, whether underground or surface sources," *id.* 1001.01, and "to prevent nuisances and potential health hazards," RSA 485-A:1 (2001).

In this case, the DES' approval states that the plaintiff's proposed development meets these rules, which include requirements concerning pipe size and the distance of the system from wells and property lines. *See, e.g.,* N.H. ADMIN. RULES, Env-Ws 1003, 1008, 1009, 1010, 1017. Relying upon this approval and *Smith v. Town of Wolfeboro*, 136 N.H. 337 (1992), the plaintiff argues that, because the board has not enacted more stringent standards for septic systems than those set forth in the administrative rules, the "DES permit creates a presumption that [the proposed] septic plan is safe and adequate."

In *Smith,* the planning board declined to remove certain restrictions preventing the owners from developing their lot because "the board felt the proposed septic systems were inadequate," despite prior approval of the systems by the New Hampshire Water Supply and Pollution Control Division (WSPCD). *Smith,* 136 N.H. at 339, 341. In addressing the propriety of the board's action, we noted that "a planning board is entitled to rely in part on its own judgment and experience in acting upon applications for subdivision approval[,] . . . is not bound by a determination of another agency, such as the WSPCD, and is free to enact more exacting or protective standards." *Id.* at 343 (quotation omitted). "In th[at] case, however, there [we]re no local standards to guide applicants as to what, beyond WSPCD approval, [wa]s required for septic system approval." *Id.*

Instead, the regulations "authorize[d] the board to disapprove a plan for 'land of such character as cannot be safely used for building purposes because of exceptional danger to health.'" *Id.* As to sewage disposal systems, the regulation stated:

> That in areas not currently served by public sewer systems it is the responsibility of the subdivider to provide adequate information to prove that the area of each lot is adequate to permit the installation and operation of an individual sewage disposal system . . . . Such information may consist of the report of the . . . [WSPCD].

*Id.* Based upon this regulation, we held that, "although the developer ha[d] the initial burden of proving adequate sewage disposal, there [wa]s a presumption under this regulation that WSPCD approval of an on-site

sewage system [wa]s adequate proof of a safe septic system." *Id.* at 344. Thus, "[o]nce the owners produced the WSPCD's report, the lots should have been approved, in the absence of other evidence that the septic systems still posed an 'exceptional danger to health.' " *Id.*

Reviewing the evidence in *Smith,* we noted that "[t]he board's concerns about . . . pollution [we]re legitimate," and that "the town [wa]s free to pass ordinances setting higher septic system standards than WSPCD . . . require[d]." *Id.* (citation omitted). We emphasized, however, that "the board [could] not deny subdivision approval on an *ad hoc* basis because of vague concerns." *Id.* (citation omitted). Because the record was devoid of "testimony that the proposed system posed an 'exceptional danger to health,' " *id.* at 344, we held that the board erred in failing to remove the restrictions on the owners' lot. *Id.* at 344-45.

We agree with the plaintiff that the present case is strikingly similar to *Smith.* The trial court distinguished *Smith* on the grounds that the regulation at issue in that case specifically stated that WSPCD's approval constituted proof of the adequacy of a sewage system, while, in its view, the site plan regulations here do not contain a similar provision. In so doing, the trial court overlooked that the town's site plan regulation instructed: "an on-site subsurface sewage disposal system may be designed and constructed *as long as* said design and construction fully complies with all applicable requirements of the New Hampshire Code of Administrative Rules; and the applicant has secured appropriate permits for the same from the [DES]." LDCR § 170-66(A)(1) (emphasis added).

■ As in *Smith,* the board here has enacted no other septic system standards guiding applicants as to what, beyond DES approval, is required to ensure the safety and adequacy of the proposed sewage disposal system. Although the board could have enacted more stringent standards, *see* RSA 485-A:32, I (2001); RSA 674:44, II, IV, the site plan regulations it chose to enact direct that an applicant is permitted to design and construct a sewage disposal system "as long as" the proposed system fully complies with DES regulations. These regulations provide the sole guidance for an applicant concerning the town's requirements for sewage disposal systems. Moreover, consistent with the stated intent of the board's site plan regulations, the purpose of the DES rules is to prevent the pollution of all water supplies. N.H. ADMIN. RULES, Env-Ws 1000.01. Thus, given our ruling in *Smith* that the Wolfeboro regulation created a presumption that WSPCD approval constituted adequate proof of a safe septic system, in this case, where the regulation goes further to specifically incorporate the DES' rules as the sewage disposal system requirements, we must conclude that this regulation creates a similar presumption. *See Smith,* 136 N.H. at 344.

As noted above, however, the purpose of site plan review is to allow the board to "properly address such issues as surface and sanitary drainage, the effect on ground water, and the creation of pollution sources." 15 P. LOUGHLIN, *supra* § 30.02, at 427. Thus, the presumption created by the regulation and DES' approval was rebuttable. *Smith,* 136 N.H. at 343. If other evidence demonstrated that, notwithstanding DES' approval, the proposed system would "involve danger or injury to health, safety, or prosperity" because, for example, it would "inadequate[ly] protect[] . . . the quality of groundwater," or result in "pollution . . . which might prove harmful to persons, structures, or adjacent properties," LDCR § 170-47(A)(1), the board had the authority to deny site plan approval. *See Smith,* 136 N.H. at 343-44.

Here, the town asserts, and the trial court found, that Carrier's testimony that community septic systems had failed in the past, combined with the location of four abutters' wells down-gradient of the proposed sewage disposal system, constitutes legitimate and persuasive evidence supporting the board's decision to deny the plaintiff's application. We disagree.

The proposed system approved by the DES was comprised of four-inch piping. The town's engineer recommended that all common sewage collection lines be six inches in diameter. The board denied the plaintiff's application subject to the condition that all such lines have a minimum diameter of six inches. The plaintiff characterizes the issue on appeal as "whether the [board] acted lawfully when it rejected the development with *six inch pipe.*" (Emphasis added.) Thus, we are limited to determining whether the trial court erred in affirming the board's failure to approve the proposed development with six-inch piping, even though the DES had approved the development with four-inch piping.

The board denied approval because it presumably agreed with the DPW that the eight-inch sewer mains that are required for municipal sewers were also necessary for the proposed community septic system. In so doing, the board reasoned that, because community septic systems had failed twenty years before as a result of poor construction, the larger piping was required to prevent the possible future failure of the proposed community septic systems.

■■ Although the board is entitled to rely upon its own judgment and experience in acting upon applications for site plan review, the board may not deny approval on an *ad hoc* basis because of vague concerns. *Smith,* 136 N.H. 343, 344. Further, the board's decision must be based upon more than the mere personal opinion of its members. *Condos East Corp. v. Town of Conway,* 132 N.H. 431, 438 (1989). Where, as here, another agency's

approval creates a presumption that the proposal protects the public interest, the record must show specific facts justifying rejection of the agency's determination; that is, concrete evidence indicating that following the agency's determination in the particular circumstances would pose a real threat to the public interest.

■ In this case, although a board member, who was also the assistant director of the DPW, informed the board that, based upon his and the DPW's experience, community septic systems had failed in the past, no evidence in the record explains why the plaintiff's proposed system, upgraded with six-inch piping, did not adequately protect against such failure. For example, the record reveals no evidence suggesting that the community septic systems that had failed twenty years before were constructed using six-inch piping, and that a reason those systems failed related to the size of the collection pipes. Such evidence could have justified the board's determination that the proposed system required larger piping to protect the public from groundwater pollution. Nor does the record indicate that six-inch piping, as recommended by the town's engineer and rejected by the board, was insufficient to prevent the system from collapsing. Indeed, nothing in the record supports the position of the board and DPW that the proposed system with six-inch piping would fail to prevent pollution of water supplies. Accordingly, the board arbitrarily and unreasonably denied site plan approval on the grounds that the proposed system did not provide sufficient piping.

■ The board denied site plan approval also because four abutters' wells are located down-gradient of the proposed twelve-unit septic system. However, the mere fact that the wells are located down-gradient of the proposed system does not necessarily imply that the proposed system poses a real danger to the abutters' water supplies. To protect against contamination of both public and private water supplies, the DES regulations specify setback requirements for septic systems, which include directing that systems be located at certain minimum distances from property lines and wells, taking into account the slope of the land. *See, e.g.,* N.H. ADMIN. RULES, Env-Ws 1001.01, 1008.04-1008.11. Again, the town has enacted no other standards relating to septic system design. Thus, the DES' approval of the plaintiff's system created a presumption that wells surrounding the system are protected.

Despite this presumption, the board denied the plaintiff's application in part upon this basis. However, nothing in the record suggests that the proposed system created an identifiable danger to the four down-gradient wells. *Cf. Smith,* 136 N.H. at 344 ("The board apparently based its decision on its belief that there existed a septic system superior to the one the

owners proposed, despite the absence of testimony that the proposed system posed an 'exceptional danger to health.' "). For example, no evidence indicates that the wells are located at such a severe slope or short distance from the system that, although the DES' minimum setback requirements are met, these individual wells are particularly vulnerable to contamination. In the absence of any specific facts suggesting that the plaintiff's system was constructed or located in such a fashion as to pose a safety risk to the four down-gradient wells, the board could not reasonably deny site plan approval based upon its vague concern that the down-gradient wells might be in danger. *See id.* To conclude otherwise would allow the board to deny approval of any proposed plan simply because a well is located down-gradient from a septic system, regardless of whether the well at issue is so far removed from the system that there is no danger of contamination.

Accordingly, we reverse the trial court's ruling upholding the board's decision to deny site plan approval because the sewage pipe design was inadequate to protect the health and safety of the residents and because four abutters' wells are located down-gradient of the septic site. We remand to the trial court for review of the board's remaining reasons for denying the plaintiff's application for site plan approval.

*Reversed and remanded.*

BRODERICK, C.J., and DALIANIS, GALWAY and HICKS, JJ., concurred.