Grafton
No. 2010-586

LIMITED EDITIONS PROPERTIES, INC.

v.

TOWN OF HEBRON

Argued: June 16, 2011
Opinion Issued: September 22, 2011

*Martin, Lord & Osman, P.A.*, of Laconia (*Willard G. Martin, Jr.* and *Suzanne S. McKenna* on the brief and orally), for the petitioner.

*Mitchell Municipal Group, P.A.*, of Laconia (*Judith E. Whitelaw* on the brief and orally), for the respondent.

CONBOY, J. The petitioner, Limited Editions Properties, Inc., appeals an order of the Superior Court (*Vaughan*, J.) upholding a decision to deny the petitioner's subdivision application by the planning board of respondent Town of Hebron (Town). We affirm.

The following facts are taken from the record. The petitioner owns 112.5 acres of property in Hebron on the northwest end of Newfound Lake with frontage on West Shore Road. A portion of the lot lies within the Hebron lake district, and the remainder lies within the rural district. The property, which is located close to Hebron Bay, includes 37.4 acres of steeply sloping land. The petitioner applied to the Hebron Planning Board (Board) for approval to develop a twenty-lot subdivision on the property. The proposed access road, leading from West Shore Road, would be located in the Hebron lake district. The road would be 2,600 feet in length, with a 10% grade for

about 1,600 to 1,700 feet, and would have a "switch back" with a 150-foot curve radius. Construction of the road would include constructing three substantial retaining walls, topped with a six-foot metal fence: one retaining wall would be 255 feet long, forty to fifty feet wide, and twenty-six feet high in the center; another would be ninety feet long and seventeen feet high in the center; the third would be seventy feet long and ten feet high in the center. Hebron Bay is down-slope from the proposed road.

Issues relating to the petitioner's subdivision application are before us for a second time. Previously, the Board determined that because the petitioner had materially revised its plan, it was required to submit a new application. We affirmed the trial court's reversal of the Board's decision. See Limited Editions Properties, Inc. v. Town of Hebron, No. 2007-0791 (N.H. June 30, 2008). When the Board resumed consideration of the application, the petitioner requested that it grant preliminary conditional approval of the plan's "overall concept" before the petitioner sought required state and federal permits. The petitioner particularly desired preliminary approval of the proposed road and lot layout. It acknowledged that the plan would not meet then-current state regulations; it intended to revise the plan to obtain the necessary permits after the Board granted preliminary approval. Once it obtained the permits, the petitioner intended to return to the Board for consideration of any necessary changes to the plan. However, the Board determined that it would not approve the subdivision application in stages; rather, it would either conditionally approve the application or deny it.

After holding several hearings on the application, the Board entered into deliberative session, discussed various aspects of the application, and voiced numerous concerns. A motion to deny the application was introduced and seconded, and after further discussion, three of the five members of the Board voted to deny the application. The petitioner subsequently appealed to the superior court, which upheld the Board's decision. This appeal followed.

The petitioner argues that: (1) the Board failed to provide a record capable of meaningful review; (2) the Board denied it a full and fair opportunity to be heard; (3) the trial court erred in concluding that a preliminary conditional approval by the Board would preclude it from subsequent review; and (4) the trial court erred in finding that the Board's decision, on the balance of probabilities, was reasonable.

■ The trial court's review of a planning board's decision is governed by RSA 677:15, V (Supp. 2010), which provides that the trial court "may reverse or affirm, wholly or partly, or may modify the decision brought up for review when there is an error of law or when the court is persuaded by

the balance of probabilities, on the evidence before it, that said decision is unreasonable." The trial court's review is limited. *Motorsports Holdings v. Town of Tamworth*, 160 N.H. 95, 99 (2010). It must treat the factual findings of the planning board as *prima facie* lawful and reasonable and cannot set aside its decision absent unreasonableness or an identified error of law. *Id.* The appealing party bears the burden of persuading the trial court that, by the balance of probabilities, the board's decision was unreasonable. *Id.* The trial court is not to determine whether it agrees with a planning board's findings, but rather whether there is evidence upon which they could have been reasonably based. *Id.* Our review is similarly limited. We will uphold a trial court's decision on appeal unless it is unsupported by the evidence or legally erroneous. *Id.*

*I. Adequacy of the Record*

■ We first address the petitioner's argument that the Board failed to provide a record capable of meaningful review. RSA 676:4, I(h) (Supp. 2010) requires that: "In case of disapproval of any application submitted to the planning board, the ground for such disapproval shall be adequately stated upon the records of the planning board." We have explained that this statutory requirement anticipates an express written record that sufficiently apprises an applicant of the reasons for disapproval and provides an adequate record of the board's reasoning for review on appeal. *See Motorsports*, 160 N.H. at 103. A written denial letter combined with the minutes of a planning board meeting can satisfy the statutory requirement. *Id.* Ultimately, whether planning board records adequately state the grounds for disapproval depends on the particular case. *Id.*

The Board did not enumerate the reasons for denying the application in its written notice of decision. However, the trial court ruled that the Board identified the basis for its decision on the record at its January 6, 2010 meeting. The court concluded, "[T]he record shows that the three members who voted against approval did so based on: aesthetics (damage to the scenic Lake District), safety concerns, and environmental concerns, including erosion and drainage."

Before addressing the merits of the petitioner's argument, we note that the record in this case includes unofficial transcripts prepared by the petitioner. The trial court relied upon these transcripts when reviewing the Board's decision, and this reliance is not challenged by either party. Under these circumstances, we assume, without deciding, that the unofficial transcripts are part of the record subject to our review.

Citing *Motorsports*, the petitioner argues that the record is deficient because the votes cast to deny the application reflected "individual sentiments rather than collective consensus," and that the Board's "general

denial" of the application was not adequate. The petitioner argues that only two Board members cited aesthetics as a reason for denial and that the board "fail[ed] to distinguish the particular reasons, explanations or finding[s] directed to any environmental and safety concerns." It contends that the "individual statements" in the record do not constitute collective reasoning.

This case, however, is distinguishable from *Motorsports*. In *Motorsports*, the town's planning board voted that the petitioner's application violated five of the seven "Section A" criteria of the town's wetlands conservation ordinance (WCO). *Id.* at 99. We concluded that the record of the board's proceedings was flawed in two respects. *Id.* at 104. First, the minutes of the subject meeting indicated that some board members had incorrectly interpreted Section A of the ordinance to apply to both access way and non-access way impact areas, when, in fact, it applied to only non-access way impact areas. *Id.* at 104-05. "Thus, when the board voted *on the project as a whole*, it [was] unknown whether board members applied Section A properly." *Id.* (emphasis added). Second, the minutes did not reflect which of the sixteen wetland impact areas or buffer zones subject to the WCO the board determined violated the applicable criteria. *Id.* at 106. Further, the record demonstrated that "virtually no discussion occurred prior to the board's vote that Motorsports' application failed to satisfy several [of the] criteria." *Id.*

We concluded:

> [T]he WCO is not a zoning ordinance under which the planning board determines whether a proposed project constitutes an appropriate use of land. Rather, it sets forth a regulatory permitting scheme governing the use of and impact upon wetlands. Thus, the planning board's task is to review the application, and identify any deficiencies it perceives regarding particular wetland impact areas.

> Under the circumstances of this case, we hold that casting separate votes on each of the seven Section A criteria with respect to the project as a whole, without providing reasons, explanations or findings directed to adversely affected wetland areas or buffer zones, does not constitute an adequate statement for the grounds of disapproval necessary to comply with RSA 676:4, I(h).

*Id.* at 108.

Here, it was not error for the trial court to conclude that the record adequately reflects the Board's reasons for denying the application. Unlike

in *Motorsports*, the Board discussed many aspects of the proposed plan during the deliberative session and identified concerns and unresolved issues regarding its impact on aesthetics, the environment, and the safety of persons and property. After a Board member moved to deny the application, and another member seconded the motion, the Board discussed the need to provide reasons for denial. The transcript reveals that the secretary of the Board reported as follows:

> Ellie said most clearly for aesthetic reasons, for probability of damage to the neighbors, Hebron Bay, and the lake. Dick said the safety of people and property, aesthetics, the clearing of trees. John Dunklee mentioned the maintenance of the dirt during the construction process erosion going into the lake, the road, and the neighbors' yards.

The Board's further discussion indicated that it agreed this recitation described its reasons for denial. A majority voted in favor of the motion. Based upon our review of this record, we hold that the trial court did not err in concluding that the record shows that the Board denied the application based on "aesthetics (damage to the scenic Lake District), safety concerns, and environmental concerns, including erosion and drainage."

## II. Full and Fair Hearing

We next address the petitioner's argument that the Board failed to provide it a full and fair opportunity to be heard because it "prematurely" denied the application before the petitioner obtained the required state and federal permits. Specifically, the petitioner argues that: (1) it should have been allowed to proceed to the state and federal permitting process because there is a presumption that state and federal requirements protect the public interest; and (2) "the hearing structure [was] cut short before vital information could be presented, despite representations to the contrary that there would be an opportunity to do so."

The trial court concluded that the record did not support the petitioner's claim that the Board "unreasonably and unlawfully denied the application based on a lack of technical data while at the same time precluding the petitioner from generating the necessary data" through the state and federal permitting process. The court found that: (1) "the record shows that the Board did not inhibit the petitioner from presenting evidence to support the application;" (2) the petitioner could have obtained the required permits before seeking the Board's approval; and (3) the record shows that the Board considered the possibility of conditionally approving the road and lot configurations based on the evidence presented to it. The trial court

also found that the petitioner's decision to approach the Board for preliminary conditional approval "before applying for permits and before generating all data that might have supported the application" was a "tactical decision," and not an error attributable to the Board.

### A. Application of Derry Senior Development, LLC v. Town of Derry

Relying on *Derry Senior Development, LLC v. Town of Derry*, 157 N.H. 441 (2008), the petitioner asserts that "[m]eeting state and federal agency requirements creates a presumption that the proposal protects the public interest," and "the record of denial should state the deficiencies of the application that pose a threat to the public interest beyond the environmental and safety issues with which the application must necessarily comply before permits will issue." It argues that the trial court erred in affirming the Board's decision because the Board failed to cite specific facts to demonstrate why the state and federal permitting process would not adequately safeguard the Town's interests.

The petitioner misreads our case law. In *Derry* and in an earlier related case, *Smith v. Town of Wolfeboro*, we concluded that applicable state permit approval created a presumption that the town's septic regulations were satisfied. *See Derry*, 157 N.H. at 451-52; *Smith v. Town of Wolfeboro*, 136 N.H. 337, 344 (1992). However, it was the language of the town ordinances themselves that created that presumption. The presumption does *not*, as the petitioner suggests, attach automatically. The regulation at issue in *Smith* provided:

> [I]n areas not currently served by public sewer systems it is the responsibility of the subdivider to provide adequate information to prove that the area of each lot is adequate to permit the installation and operation of an individual sewage disposal system . . . . Such information may consist of the report of . . . the State Water Supply and Pollution Control [Division].

*Smith*, 136 N.H. at 343 (quotations omitted). We concluded, "[A]lthough the developer has the initial burden of proving adequate sewage disposal, there is a presumption *under this regulation* that [State Water Supply and Pollution Control Division] approval of an on-site sewage system is adequate proof of a safe septic system." *Id.* at 344 (emphasis added).

In *Derry*, the regulation at issue provided, in pertinent part:

> In areas where municipal sewer is not available, an on-site subsurface sewage disposal system may be designed and constructed as long as said design and construction fully complies with all applicable requirements of the New Hampshire Code of

Administrative Rules; and the applicant has secured appropriate permits for the same from the [New Hampshire Department of Environmental Services].

*Derry*, 157 N.H. at 448 (emphasis and quotations omitted). We stated, "[G]iven our ruling in *Smith* that *the Wolfeboro regulation created a presumption* that [State Water Supply and Pollution Control Division] approval constituted adequate proof of a safe septic system, in this case, where the regulation goes further to specifically incorporate the [department of environmental services's] rules as the sewage system requirements, we must conclude that *this regulation creates a similar presumption.*" *Id.* at 450 (emphases added). We determined, "Where . . . another agency's approval creates a presumption that the proposal protects the public interest, the record must show specific facts justifying rejection of the agency's determination; that is, concrete evidence indicating that following the agency's determination in the particular circumstances would pose a real threat to the public interest." *Id.* at 451-52.

Here, there are no ordinances similar to those giving rise to the presumption in *Derry* and *Smith*. Nor were permits issued, nor government agency determinations rendered, for the Board to consider in light of the local regulations. Indeed, when considering whether to approve the application, conditioned on the petitioner securing state and federal permits, a Board member stated, "I don't want the applicant to think that just because it passes every one of the State requirements that it automatically is a pre[-]pass in Hebron because they may not address some of our issues that are legitimate," and other Board members indicated their agreement with this premise. Under these circumstances, we decline to rule that the Board was required to assume that the permits would be issued and to explain why the public interest would not therefore be protected.

*B. Hearing Structure*

We next address the petitioner's claim that the Board prematurely denied its application because "the hearing structure [was] cut short before vital information could be presented, despite representations to the contrary that there would be an opportunity to do so." It contends that the Board led it to believe that the process "was undertaken with an eye toward state permitting and the Board's re-review when complete," and then "change[d] course before the applicant . . . had the opportunity it was led to believe it would have to demonstrate the integrity of the application measured by objective standards." We disagree with the petitioner's characterization of the process the Board stated it would follow.

The record reflects that the petitioner's counsel stated the applicant was requesting "preliminary design approval" and "a preliminary decision" regarding the road and lot configurations. As early as February 2009, the petitioner sought preliminary approval of the road and lot layout, with the expectation that the Board would conduct further review after the state and federal permits were obtained. The Board, however, clearly communicated that such a bifurcated process was not acceptable to it. For example, at the February 4, 2009 meeting, the Board chair stated: "[W]e're not going to, in my view — and correct me if I'm wrong — going to approve a road, you know, all by itself. We're going to look at the entire subdivision because that's what we're looking at . . ." Throughout several meetings thereafter, the petitioner continued to request bifurcation, and the Board continued to reject the request. The Board made clear that it would not limit its review to the proposed road and lot layout, but, instead, intended to review the application as a whole to approve the subdivision application, with or without conditions, or deny it altogether.

We also reject the petitioner's assertion that "the Board Chairman indicated that the Board would receive input from the applicant and the public and ask the applicant for specific items at the end of the session." The petitioner cites a portion of the transcript of the February 9, 2009 meeting, which reads, in part, "Once the Chair decides to close the public testimony, the Board will discuss the comments and may ask either a member of the public or the applicant's team clarifying questions so that we can get all of these things addressed." We do not interpret this as a commitment from the Board to ask the petitioner for "specific items" in lieu of the petitioner's responsibility to provide the Board with evidence sufficient for it to make a decision. *See Summa Humma Enters. v. Town of Tilton*, 151 N.H. 75, 79 (2004). Indeed, the Board reminded the petitioner of its obligation from the beginning of the process at the December 3, 2008 meeting, when the Board Chair stated that, "the onus is on the Applicant to bring up materials to be considered."

Further, we do not agree with the petitioner's characterization of the record when it asserts that "the Hebron Board advised the [petitioner] that it would not seek further engineering review understanding that concerns as to safety and the environment not already considered would be addressed at the state and federal level." The petitioner cites two pages in the transcript of the April 1, 2009 meeting to support this assertion. The first citation refers to testimony by the petitioner's engineer, but this testimony does not demonstrate that the Board agreed to delay seeking further engineering review to address existing concerns until after the petitioner secured necessary permits. The second citation refers to the following exchange:

[Petitioner's counsel]: No. Mr. Chairman, we're — as Mr. Johnson indicated, we're looking for limited area approval so that we can continue this process at the State level. We can't really go to the State until the Town has made its initial call on the layout.

Chairman Larochelle: Okay. Thank you. All right, Planning Board.

[Member of the Board]: You've got one more question out there.

Chairman Larochelle: Okay.

[Member of the public speaks on another issue]

We cannot interpret this reference as supporting the petitioner's contention.

The record reflects that the Board considered requiring the petitioner to pay for another engineering review to aid its assessment of the application. The petitioner disputed the necessity of a second engineering review, arguing that the Town's review engineer had already provided his conclusions on the proposed plan, that another engineering review would not provide any new information, and that the Board had all the information it needed to approve the application or approve it with conditions. From the petitioner's standpoint, the application was complete. Ultimately, the Board declined to require additional engineering review and resolved to consider the merits of the application as submitted. The record demonstrates that the Board's process of reviewing the application as a whole, rather than in stages, was not contingent on additional engineering review.

We also reject the petitioner's argument that the Board members impermissibly based their decision on personal opinion. Although a planning board is entitled to rely in part on its own judgment and experience in acting upon applications, the board may not deny approval on an *ad hoc* basis because of vague concerns. *Derry,* 157 N.H. at 451. The board's decision must be based upon more than the mere personal opinion of its members. *Id.*

The trial court found that "the record reflects prolonged discussion by Board members of relevant, lawful considerations," that the evidence supported the Board's decision, and that the record demonstrates that the Board carefully considered whether it could approve the application with conditions consistent with applicable regulations. The petitioner offers no argument that the trial court legally erred in making these findings. It offers only its characterization of the record as "highlighted by individual

sentiments and 'feelings.' " We agree with the trial court that while "Board members may have, at times, expressed personal opinions and feelings, the record shows that they based their decision on the evidence presented."

Under all the circumstances, we cannot conclude that the trial court erred in rejecting the petitioner's argument that the Board failed to afford it a full and fair hearing.

### III. Preliminary Conditional Approval

The petitioner argues that the trial court erred in finding that a preliminary conditional approval by the Board would preclude it from any subsequent review. The petitioner challenges the trial court's statement that "[i]f [the Planning Board] approved the application with conditions, it might never have another opportunity to revisit the application and conditions." We disagree with the petitioner's interpretation of the court's order.

The trial court stated: "As the Court has explained in its discussion of the procedural background, the Board determined that it could not issue an interim decision. If it approved the application with conditions, it might never have another opportunity to revisit the application and conditions." Earlier in its order, the court stated: "[The Board] determined that it could not issue an interim decision — that it must either deny the application or approve it with conditions, and, if it approved the application with conditions, it would not necessarily be able to change those conditions at a later date." In considering the trial court's order as a whole, we cannot conclude that the trial court rendered a legal ruling that in the event the Board granted preliminary conditional approval as requested by the petitioner, it would be precluded from conducting any subsequent review. Rather, the trial court simply described the Board's concern about engaging in a bifurcated process, and this description is supported by the record.

### IV. Sustainable Exercise of the Trial Court's Discretion

The petitioner next argues that the trial court unsustainably exercised its discretion by finding the Board's decision to be reasonable on the balance of probabilities. "The court may reverse or affirm, wholly or partly, or may modify the decision brought up for review when . . . the court is persuaded by the balance of probabilities, on the evidence before it, that said decision is unreasonable." RSA 677:15, V. The review by the superior court is not to determine whether it agrees with the planning board's findings, but to determine whether there is evidence upon which they could have been reasonably based. *Motorsports*, 160 N.H. at 99.

The trial court stated:

> It is undisputed that the property contains steep slopes, and much of the attention during hearings focused on the proposed construction of a road and related retaining walls. The Board members who voted against approval were not persuaded that the evidence presented showed that the construction on the slopes would not undermine aesthetics, safety, and the environment.

After a detailed review of the record, the trial court determined that the Board could have lawfully found that the petitioner had not shown that it satisfied the subdivision regulations, particularly Hebron Subdivision Regulation 6.3, which provides in relevant part:

> Land of such character that it cannot be safely used for building purposes because of exceptional danger to health or peril from fire, flood, topography or other menace, shall not be platted for residential occupancy, or for any other uses as may increase danger to health, life or property, or aggravate the flood hazard until appropriate measures have been taken by the subdivider to eliminate such hazards.

The trial court found that the Board had heard "evidence about the environmental effects of blasting (and residual nitrates) and about run off," and that, while evidence "indicated that proper oversight and construction techniques could address the environmental concerns, . . . it did not refute the potential for environmental damage." The court specifically found that "the Board was presented with expert evidence indicating that even the best plans could result in erosion." Further, the court recognized that it was "undisputed that the road would comply technically with the subdivision regulations regarding slope," but noted that "a number of aesthetic, environmental, and safety concerns about the road were raised during the hearings." As to aesthetics, the trial court found that the petitioner did not present the Board with an accurate representation of the appearance of the large proposed retaining walls in relation to the tree cover. The trial court concluded that the Board was not persuaded that the evidence showed that its concerns, including erosion, drainage and potential harm to Hebron Bay [and Newfound Lake], were adequately addressed, even with imposition of conditions.

The trial court's findings and conclusions are supported by the evidence in the record. For example, the Town's review engineer outlined several concerns he had about the proposed project, including the danger posed by erosion during construction: "I see the potential of this site having some

500

major erosion problems during construction . . . . My concern is during construction, and how will a major storm be handled when the road construction is fully involved, and before vegetation becomes established." He also noted concerns about inadequate drainage and the potential for water run-off: "This project has a potential to wash sediment into the Lake during construction. The general contractor . . . will be dealing with constructing the project on very steep slopes, and storm water will want to take anything in [its] path with it toward the lake."

An environmental impact report emphasized the need for oversight during construction: "The engineering requirements cannot be taken lightly and outline extensive erosion control measures that must be adhered to." Another environmental expert opined, "[Due] to the steep slopes and the amount of land clearing needed for site development it is imperative that all [best management practices] for erosion control be monitored constantly, as even the best designed erosion control plans can fail with a significant rainstorm over night when inspectors are not on site." Further, the executive director of the Newfound Lake Region Association testified that contamination of the lake by nitrates would not dissipate over time.

The Board was also concerned about the risks associated with the extraordinary length of the proposed road at a steep pitch with a significant curve radius, and the evidence supports those concerns. For example, the Town's review engineer identified issues relating to the road's safety: "The road system serving the units has a stretch of 1,800 feet of 10% slope. This is a long run of steep slope without a break in the slope, and the sharp and long curve of 150 [feet] radius is in the 10% slope area." While the engineer recommended that the road "remain private" so that the Town would not bear any responsibility for maintenance, including sanding and salting, he also expressed concern about emergency vehicle access in the winter time and associated Town liability. A Board member who voted to deny the application emphasized that deeming the road "private" would not necessarily adequately protect the Town, the abutters, and Town taxpayers.

With respect to aesthetics, the Board expressed its concern about the impact of the large retaining walls on the scenic views in the protected lake district, especially from the vantage point of beach area. The record, however, is devoid of any information from the petitioner to alleviate this concern. Indeed, in deliberative session, Board members discussed that the actual appearance of the proposed retaining walls was unknown and remained a significant concern.

In challenging the trial court's decision to affirm the Board's denial as reasonable under the "balance of the probabilities" standard, the petitioner

contends: "[T]he Planning Board did not have the technical data it needed to make an adequate decision, because [it] made [its] decision before the permitting data was developed [during the state and federal permitting process]." However, as noted above, it was the responsibility of the petitioner to present the Board with evidence sufficient for it to make a decision. *See Summa Humma Enters.*, 151 N.H. at 79. As the trial court determined, "The record shows that the Board did not inhibit the petitioner from presenting evidence to support the application," and the petitioner's decision not to first invest in the permitting process, while perhaps understandable, "is not an error attributable to the Board." In short, the record supports the Board's concerns about, among other things, the potential for significant and lasting damage occurring during the construction process, and further evinces the petitioner's failure to adequately alleviate those concerns.

We hold that the petitioner has failed to establish that the trial court erred in affirming the Board's decision. Other arguments raised by the petitioner are either not developed sufficiently to warrant our review, *see In the Matter of Aube*, 158 N.H. 459, 466 (2009), or are, under the circumstances of this case, without merit, and do not warrant further discussion, *see Vogel v. Vogel*, 137 N.H. 321, 322 (1993).

*Affirmed.*

DALIANIS, C.J., and DUGGAN, HICKS and LYNN, JJ., concurred.