NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us.  Opinions are available on the Internet by 9:00 a.m. on the morning of their release.  The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Waste Management Council
No. 2020-0049

APPEAL OF CONSERVATION LAW FOUNDATION
(New Hampshire Waste Management Council)

Argued: November 17, 2020
Opinion Issued: February 2, 2021

Conservation Law Foundation, Inc., of Concord (Thomas F. Irwin on the brief and orally), for the petitioner.

McLane Middleton, Professional Association, of Concord (Mark C. Rouvalis, Gregory H. Smith, and Viggo C. Fish on the brief, and Mr. Rouvalis orally), and Gail M. Lynch of Hampton, on the brief, for the respondent.

Gordon J. MacDonald, attorney general (Joshua C. Harrison, assistant attorney general, on the memorandum of law), for the New Hampshire Department of Environmental Services.

DONOVAN, J.  The petitioner, Conservation Law Foundation (CLF), appeals an order of the New Hampshire Waste Management Council (Council) denying CLF's appeal of a permit, issued by the New Hampshire Department of Environmental Services (DES), which authorizes the expansion of a landfill owned by the respondent, Waste Management of New Hampshire, Inc.

(WMNH).[1]  CLF argues that the Council committed legal error by: (1) determining that DES acted reasonably in granting the permit despite finding that a condition therein is ambiguous; and (2) premising its decision on the occurrence of future negotiations between DES and WMNH to resolve the ambiguity.  We affirm because we conclude that the permit's ambiguities do not render the Council's decision unlawful.

## I. Facts

The following facts were found by the Council or are supported by the administrative record.  WMNH owns and operates the Turnkey Recycling and Environmental Enterprise facility, a solid waste management facility located in Rochester, where WMNH engages in various waste management activities, such as composting leaf and yard waste, extracting gas from landfills, and maintaining its fleet of vehicles.  The facility also includes three plots of land dedicated to landfills, two of which are closed and inactive.  The third plot, known as Turnkey Landfill Rochester III (TLR-III), remains open and active.[2]

In May 2017, WMNH applied to DES for a permit authorizing it to expand TLR-III.  The permit would allow WMNH to increase the landfill's existing 218-acre footprint by approximately 58 acres.[3]  According to DES's projections, without the proposed expansion New Hampshire's waste disposal capacity will fall short of demand beginning in 2020.  If the permit were to be approved, disposal capacity would meet the projected need through 2034.

In June 2018, DES approved the permit.  As part of the approval process, DES determined, as required by statute, that the TRL-III expansion would provide a substantial public benefit if WMNH complies with certain conditions.  See RSA 149-M:11, III, IX (2005).  Specifically, Condition 21 of the permit requires, among other things, that each year the facility operates, WMNH "[d]emonstrate that the sources, in aggregate, from which [it] accepted municipal solid waste (MSW) and/or construction and demolition (C&D) debris for disposal achieved a minimum 30 percent waste diversion rate to more preferred methods than landfilling as outlined in" New Hampshire's statutory waste disposal hierarchy.  See RSA 149-M:3 (2005).  If WMNH cannot demonstrate a minimum 30 percent diversion rate, then it must submit a report to DES evaluating the diversion rate achieved, the "primary factors

---

[1] DES submitted a memorandum of law explaining that it "concurs in the arguments and positions of WMNH in its brief."

[2] The initial permit for TLR-III was granted in 1995, and subsequent permits have allowed it to expand.

[3] The permit would also allow TLR-III to expand vertically, increasing its permitted disposal capacity by approximately 15.9 million cubic yards.  To ensure that landfill capacity is available through 2034, DES capped the amount of airspace that may be filled annually.

affecting [the] diversion rate," and the "practicable measures that [WMNH] will undertake to improve the diversion rate and an implementation schedule for doing so." Condition 21 further requires that WMNH "assist 15 or more New Hampshire solid waste generators per year with establishing or improving programs that assist in the implementation of the goals and hierarchy" in New Hampshire's solid waste disposal statutes. See RSA 149-M:2 (2005), :3.

CLF appealed to the Council DES's decision to grant the permit. As relevant here, it argued that the permit, including Condition 21 in particular, is "inconsistent with, and premised on a failure to comply with, public benefit requirements pertaining to solid waste management planning, and statutorily required state solid waste planning and reporting." The Council heard five days of testimony from witnesses called by CLF and WMNH and received hundreds of pages of exhibits from both parties.

The Administrator of DES's Solid Waste Management Bureau, which was responsible for reviewing the permit application, explained how Condition 21, which takes effect in 2021, will function. DES expects that WMNH will obtain diversion data from its waste generators, demonstrate that those generators, in the aggregate, divert 30 percent of their waste, and report that data to DES. If WMNH fails to demonstrate that its waste generators are diverting 30 percent of their waste, "that's not a violation of the permit," but rather triggers the requirement that WMNH analyze what obstacles impede reaching the 30 percent threshold and what measures are needed to achieve that number.[4] According to a DES witness, Condition 21's diversion threshold and reporting requirement are novel and have not been included in a solid waste or landfill permit before. The Council noted that DES is incorporating similar conditions into subsequent waste management permits.

The Council heard testimony that there is currently no standard for calculating diversion rates. The Director of DES's Waste Management Division testified that "[d]iversion is not specifically defined in [New Hampshire's Waste Management statute] or in [DES's] solid waste rules." See RSA ch. 149-M (2005 & Supp. 2020); N.H. Admin. R., Env-Sw 102. He further testified, however, that he believes the statutory language suggests that "diversion includes basically anything that is or could . . . end[] up as a solid waste, any method including waste reduction or reuse, any kind of method whatsoever, composting, that keeps that waste from ultimately being disposed by either landfilling or incineration." See RSA 149-M:2, I.

The testimony also reveals that DES and WMNH did not, prior to the permit's approval, discuss the precise method by which the diversion rate will

---

[4] A witness for WMNH testified that, if the 30 percent threshold is not met, he expects that WMNH could take measures such as engaging in public education, solid waste operator training programs, or conducting market studies.

be calculated for purposes of Condition 21. The DES staff member who was the primary reviewer of the permit explained that, before Condition 21 goes into effect, DES will discuss with WMNH how it will calculate the diversion rate to ensure consistency. A senior manager for WMNH similarly testified that he expects WMNH will consult with DES to determine the details of the calculation, "much like other permit conditions that [WMNH] regularly deal[s] with." According to this witness, WMNH acknowledges that the methodology for calculating the diversion rate "is something we're going to have to further review and work with [DES] on."

Because the method by which the diversion rate will be determined is not set forth in the permit, it is unclear how Condition 21's diversion rate will be calculated and, specifically, what waste will be included in that calculation.[5] For example, the methodology WMNH has previously employed to calculate its diversion rate considers leaf and yard waste as diverted, although such waste cannot be disposed of at TLR-III and, according to a DES witness, is not considered solid waste in New Hampshire. A DES witness testified that leaf and yard waste would not be included in Condition 21's diversion calculation. The senior manager for WMNH agreed, noting that TLR-III's current calculations likely yield a higher diversion rate than that which will be calculated under Condition 21, in part because leaf and yard waste may not count towards that rate.[6]

With regard to Condition 21's requirement that WMNH assist fifteen or more New Hampshire waste generators in establishing or improving diversion programs, DES witnesses testified that WMNH may work with the same generator two years in a row, "[a]s long as they're establishing or improving diversion." The senior manager for WMNH testified that WMNH has an idea "as to how [it] would select . . . or identify [the fifteen generators with which it will work] based on trying to achieve the most success, the most quantity," and that it would also discuss its selections with DES.

---

[5] Condition 21 does state that the diversion calculation "shall not be required to include" certain types of MSW and C&D waste for which there is "no environmentally safe or economically sound diversion alternative[] to landfilling."

[6] Another example of waste that may or may not be considered diverted for purposes of Condition 21 is "alternative daily cover." At the end of each day, landfilled waste is covered with approximately six inches of an approved cover material, such as soil. The daily cover material helps mitigate problems with "vermin, birds," and the inevitable odor emanating from tons of newly deposited garbage. Certain C&D waste, which would have otherwise been landfilled, can be used as alternative daily cover. This waste thus serves a purpose other than being mere landfilled waste, but still ultimately ends up in the landfill. WMNH currently includes alternative daily cover in calculating its C&D diversion rate and, although the Council noted that alternative daily cover "exists in that form for only one day," DES witnesses indicated that alternative daily cover would be included in calculating the rate.

After deliberating for a full day, the Council rejected CLF's appeal. In its written decision, the Council described several "ambiguities" with regard to Condition 21, including that it is "unclear whether certain materials are validly included in the definition [of diversion] given their particular characteristics" and "there are no requirements describing the makeup of the [fifteen] generators" with which WMNH will work. The Council acknowledged that Condition 21 "was vague in several respects[] and would require flexibility and refinement in coming to an agreed definition of 'diversion' for this provision to be enforceable."

On a motion to find that DES "acted unreasonably in failing to provide a definition of the 30 percent diversion rate contained in [Condition 21]," thus "rendering the public benefit requirement unmet," the Council split its vote, three in favor and three opposed. Because CLF bore the burden of demonstrating that DES's decision was "unlawful or unreasonable," RSA 21-O:14, I-a (2020), the split vote resulted in the denial of its appeal.[7] CLF filed a motion for rehearing and reconsideration, which the Council denied. This appeal followed.

## II. Standard of Review

CLF bears the burden of demonstrating that the Council's decision is clearly unlawful or unreasonable. RSA 541:13 (2007); see RSA 21-O:14, III (2020). We will not set aside or vacate the Council's decision unless it contains an error of law, or CLF establishes, by a clear preponderance of the evidence, that its decision was unjust or unreasonable. RSA 541:13. We deem the Council's findings on questions of fact properly before it to be prima facie lawful and reasonable. Id.

## III. Discussion

New Hampshire's Solid Waste Management statute requires DES to deny any permit application when the applicant fails to demonstrate that it satisfies three "substantial public benefit" criteria. RSA 149-M:11, III, IX. "'Public benefit' means the protection of the health, economy, and natural environment of the state of New Hampshire . . . ." RSA 149-M:4, XVII (Supp. 2020). As relevant here, we need only consider the criterion which requires that, in determining "whether a proposed solid waste facility provides a substantial public benefit," DES assess "[t]he ability of the proposed facility to assist the

---

[7] The Council also determined that: (1) DES did not act unreasonably in determining that the permit sufficiently addressed the State's waste disposal capacity needs; (2) in light of the lack of regulations regarding certain chemicals, DES did not act unreasonably in granting the permit without a requirement that WMNH test for those chemicals; and (3) DES did not act unlawfully or unreasonably in granting the permit without conditions addressing methane gas emissions from the landfill. CLF does not challenge these findings on appeal.

state in achieving the implementation of" New Hampshire's waste reduction hierarchy and goals. RSA 149-M:11, III(b).

New Hampshire's waste reduction goal is to, "by the year 2000, . . . achieve a 40 percent minimum weight diversion of solid waste landfilled or incinerated on a per capita basis." RSA 149-M:2, I. "Diversion shall be measured with respect to changes in waste generated and subsequently landfilled or incinerated in New Hampshire. The goal of weight diversion may be achieved through source reduction, recycling, reuse, and composting, or any combination of such methods." Id. The solid waste disposal hierarchy sets forth, in descending order of preference, the following waste management methods: source reduction, recycling and reuse, composting, waste-to-energy technologies, incineration without resource recovery, and landfilling. RSA 149-M:3.

CLF argues that, in light of the Council's finding that Condition 21 is ambiguous with regard to how the diversion rate will be calculated and the parameters for selecting the fifteen waste generators with which WMNH must work to lower their diversion rates, DES could not have determined that the permit would assist the State in achieving its solid waste diversion goal or hierarchy, which inhibited it from certifying that the facility provides a substantial public benefit. See RSA 149-M:2, :3, :11, III(b). Accordingly, CLF argues that the permit is legally flawed and that the Council should have remanded the matter to DES. We disagree.

Undisputed evidence in the record supports the Council's conclusion that DES did not act unreasonably in determining that Condition 21, as written, will "assist the state in achieving the implementation of the hierarchy and goals under RSA 149-M:2 and RSA 149-M:3." RSA 149-M:11, III(b). The Director of DES's Waste Management Division described Condition 21 as a "very progressive condition" that would increase diversion rates without "sett[ing] [WMNH] up for failure." He explained that Condition 21 "imposes concrete realistic direct actions that [WMNH] would need to do that would absolutely directly assist . . . with reaching the hierarchy and the goals set out in the statute." An attorney for CLF, who testified at the hearing, similarly stated that, although she believed it "could do much . . . more," Condition 21 "will assist the State in achieving its" waste reduction goals.

The record indicates that Condition 21 will do so, in part, by providing DES a much-needed data-gathering mechanism. A DES staff member testified that it is "unclear" whether the State has achieved the 40 percent statutory diversion goal because DES does not have access to the full amount of data necessary to make such a determination. See RSA 149-M:2, I. He further testified that the State's diversion rate has not been calculated recently, in part

6

because the amount of data necessary to determine the precise rate is vast.[8] Indeed, according to the CLF attorney, no one "know[s] what the waste in New Hampshire is actually composed of." Thus, in order to ascertain meaningful numbers with respect to waste and diversion, DES is seeking to improve the quality of the data it collects. One challenge to collecting the necessary data is that waste generators themselves do not report diversion numbers directly to DES. Rather, data reported to DES comes, in part, from authorized and permitted waste management facilities, like the Turnkey Recycling and Environmental Enterprise facility.

Condition 21 seeks to fill the gap in data and provide DES with valuable information by requiring that WMNH demonstrate that its waste generators "achieved a minimum 30 percent waste diversion rate" and, if the 30 percent threshold is not met, report what the rate was, the primary factors affecting the rate, and practicable measures that WMNH will take to improve it. According to a DES staff member, any effort by WMNH to contact its generators and require that they "think about diversion and provide that information to [WMNH]," which would report the data to DES, would provide access to data that DES currently lacks. Such data collection "would assist [DES] in working towards" the statutory goals, in part because it will increase DES's understanding of where the State stands with regard to waste diversion. As the CLF attorney testified, "getting data from haulers as well as disposal facilities is an excellent first step": "more data and better data with consistent metrics around [diversion] weight is . . . a good thing."[9] Thus, regardless of how the diversion rate is calculated under Condition 21, the permit will assist the State in achieving its waste diversion goal and disposal hierarchy by providing DES crucial information about the composition of the waste stream, in particular whether and how diversion is being achieved through "source reduction, recycling, reuse, and composting," RSA 149-M:2, I, informing the development and implementation of future diversion strategies. See RSA 149-M:2, :3.

The record also supports the Council's decision because it demonstrates that Condition 21 will cause WMNH to work with its customers to increase their diversion rates. According to a DES witness, prior to 2021, when Condition 21 takes effect, a waste generator "could contract with [WMNH] for whatever waste they have with no accountability or even any thought to divert

---

[8] Contributing to the difficulty, and perhaps impossibility, of calculating an exact and total diversion rate is the problem of capturing mundane and essentially immeasurable diversion such as "backyard composting . . . or donation to . . . a clothing drive."

[9] CLF draws our attention to testimony from the WMNH senior manager that WMNH would not turn away waste intended for TLR-III from generators who refuse to provide diversion data. Even assuming, however, that some waste generators will not provide diversion information to WMNH, the record reflects that any increase in the data regarding the waste stream will contribute to DES's understanding of diversion rates, and, as a result, assist the State in implementing the statutory waste reduction goals and hierarchy. See RSA 149-M:2, :3, :11, III(b).

some of it that they would normally send to the landfill." The Director of DES's Waste Management Division stated he believed that WMNH, which provides at least some waste management services to customers in approximately 80 percent of New Hampshire communities, communicating with its generators about their diversion rates "will result in significant improvements in the diversion rates of their customer base." This work will, according to DES witnesses, assist the State in meeting its diversion goals.

Condition 21's requirement that WMNH work with fifteen or more waste generators further supports a conclusion that the permit assists the State's efforts to achieve its waste reduction goals and hierarchy, irrespective of which generators collaborate with WMNH. The senior manager for WMNH explained that WMNH already does "a form of that regularly," and will now "make it a little more robust." He also explained that he expects some waste generators will be uninterested in working with WMNH to increase their diversion rates, and that WMNH, knowing "the lay of the land," will be able to select those who are willing to collaborate to increase diversion. Requiring WMNH to collaborate with waste generators to improve their diversion methods and decrease the amount of waste they generate and contribute to TLR-III will decrease the amount of waste ultimately landfilled, and, accordingly, Condition 21 will assist the State in achieving its waste diversion goals and disposal hierarchy. See RSA 149-M:2, :3. In sum, given the evidence before the Council, we cannot conclude that Condition 21's ambiguities render the Council's decision unlawful. See RSA 541:13; Appeal of Garrison Place Real Estate Inv. Trust, 159 N.H. 539, 543-44 (2009) (reversing a Wetlands Council decision partly because DES's determination that a permit condition requiring the permittee to gather data on the impact of the permit satisfied statutory wetlands protection requirements was entitled to deference); cf. Derry Senior Dev. v. Town of Derry, 157 N.H. 441, 452-53 (2008) (concluding that a planning board arbitrarily and unreasonably denied approval of a site plan because "nothing in the record" supported the board's justifications for denying approval).[10]

CLF also argues that the Council erred as a matter of law because Condition 21's ambiguities undermined the ability of the Council, and now our

---

[10] We note that DES has discretion to enforce Condition 21 by, inter alia, revoking or suspending the TLR-III permit if it concludes that WMNH is failing to satisfy Condition 21's requirements and does not take action to remedy those failures. See RSA 149-M:6, I (2005) (authorizing DES to enforce solid waste permits); N.H. Admin. R., Env-Sw 306.03 (establishing the procedure by which a solid waste permit may be revoked or suspended for good cause following a DES investigation or inspection). Indeed, a DES employee explained that Condition 21's reporting requirements would allow DES's compliance section to assess WMNH's adherence to the permit. He further testified that a failure to comply with any permit provision, for example if WMNH refuses to report diversion data to DES, could result in an enforcement action by DES, including the assessment of a fine.

ability, to determine whether the permit provides a "substantial public benefit." RSA 149-M:11, III. However, evidence in the record supports the Council's conclusion that CLF failed to meet its burden of showing that DES acted unreasonably in concluding that the permit satisfied the substantial public benefit requirement. See id. Thus, we conclude that neither the Council's nor our ability to review DES's determination is impeded by the lack of a precise definition of the diversion calculation method or standards for selecting the generators with which WMNH will work.

CLF points us to Society for Protection of New Hampshire Forests v. Site Evaluation Committee, 115 N.H. 163 (1975), and Hampton National Bank v. State, 114 N.H. 38 (1974), in support of its argument that Condition 21's "vague and ambiguous nature" inhibits our ability to determine whether the permit provides a substantial public benefit. Yet, as CLF acknowledges, both decisions "address the need for agencies to provide written findings in their decisions," not whether an ambiguous permit condition is necessarily unlawful because it frustrates appellate review. See Society for Protection, 115 N.H. at 175 (remanding for "the site evaluation committee [to] provide basic findings of fact on the existing record to support the ultimate conclusions it has reached"); Hampton Nat'l Bank, 114 N.H. at 45 ("We hold that the written findings made by the board in this case constituted a sufficient 'record' . . . ."), overruled by Appeal of Portsmouth Trust Co., 120 N.H. 753 (1980).

Finally, CLF argues that the Council erred because, by premising its denial of CLF's appeal upon DES's and WMNH's future negotiations to determine how diversion will be calculated, the Council's decision subverts the process of administrative procedure, relies upon extra-record facts, and strips CLF of its statutory right of appeal. CLF further argues that the Council's decision deprived it of its due process right to challenge whether the permit provides a substantial public benefit. These arguments are unavailing because, as discussed above, Condition 21's ambiguities did not render DES incapable of determining that Condition 21 provides a substantial public benefit. Accordingly, that DES and WMNH will ultimately decide which materials will be included in the diversion calculations for purposes of Condition 21 after the permit is granted does not, as CLF argues, "place[] beyond . . . CLF's ability to be heard on appeal[] the question whether the permit . . . will satisfy the substantial public benefit standard."

"The fundamental requisite of due process is the right to be heard at a meaningful time and in a meaningful manner." Appeal of Portsmouth Trust Co., 120 N.H. at 758. CLF was afforded an ample and meaningful opportunity to present its objections to the permit and the terms of Condition 21, including a five-day hearing during which it presented testimony and cross-examined WMNH's witnesses and the Council accepted exhibits. In particular, CLF was provided with the opportunity to, and did in fact, vigorously contest whether

Condition 21's terms sufficiently allowed DES to determine that the permit provides a substantial public benefit.  <u>See</u> RSA 149-M:11, III.

We offer one observation in conclusion.  Neither the legislature, by statute, nor DES, by rulemaking, has defined how diversion rates should be calculated.  The lack of a statewide definition makes it problematic, even with robust data, to determine where the State stands with regard to the 40 percent diversion goal set forth in RSA 149-M:2.  In light of the Council's finding that DES is incorporating conditions similar to Condition 21 into other waste management permits, we encourage the legislature or DES to establish a method by which diversion rates will be calculated.

IV. Conclusion

For the reasons stated above, we affirm the Council's decision.

<u>Affirmed</u>.

HICKS, BASSETT, and HANTZ MARCONI, JJ., concurred.